Kerri W. Feeney, WSBA #34080
Feeney Law Office PLLC
1177 Jadwin Avenue, Suite 104
Richland, Washington 99352
(509) 946-5200

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 16 2010

JAMES R. LARSEN, CLERK
_____ DEPUTY
RICHLAND, WASHINGTON

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT RICHLAND

**CV-10-3118-EFS**

| | |
|---|---|
| MARIA SANCHEZ and JOSÉ GARCIA,<br><br>    Plaintiffs,<br><br>  v.<br><br>GRANDVIEW SCHOOL DISTRICT No. 200,<br><br>    Defendant. | NO.<br><br>COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, DAMAGES, ATTORNEY FEES AND COSTS<br><br>Note on Motions Calendar: |

## I.  INTRODUCTION

Plaintiffs José Garcia and his mother, Maria Sanchez, hereby file this Complaint and Motion for Declaratory Judgment and Injunctive Relief due to the ongoing discrimination and deprivation of educational access to which José Garcia is being subjected by the Grandview School District ("District") through its agents,

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 1 of 13

**FEENEY LAW OFFICE PLLC**
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

administrators, and employees.  In this action Plaintiffs Maria Sanchez and José Garcia seek enforcement of an Administrative Order issued October 13, 2010 through the Office of Superintendent of Public Instruction that directed the District to develop and implement an appropriate educational program for José Garcia within 60 days of the date of the Order.  The Plaintiffs request the Court grant them relief as detailed below.

The Plaintiffs seek immediate enforcement of that portion of the Administrative Order that should have been implemented by December 13, 2010, plus reasonable attorney fees and costs incurred in bringing this action.  Immediate implementation of the Administrative Order is necessary so that Plaintiff José Garcia is not further harmed, deprived of educational opportunity and so he can have equal access to education during the pendency of this action.   The Plaintiffs also seek damages of $2000.00 per day for each day the program was and is not in effect, from December 13, 2010 to the date of full compliance.

## II.  JURISDICTION AND VENUE

1.      This action arises under the Individuals with Disabilities Education Act, 42 U.S.C. §§ 1401 *et seq.* and the implementing regulations, the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act ("ADA") 42 U.S.C. § 1210 *et seq.*

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 2 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352
TEL. 509.946.5200 • FAX 509.946.2411

2.      Claims raised in this Complaint and Request for Injunctive Relief also stem from Washington State Constitutional rights and Washington State non-discrimination laws.

3.      This Court has jurisdiction over the parties, facts, allegations and remedies requested in this Complaint and Request for Injunctive Relief due to the federal claim and federal questions raised.  This Court has pendent jurisdiction and supplemental jurisdiction over the plaintiffs' state law claims under Article IX, Sec. 1 of the Washington Constitution, R.C.W. 49.60 and Sections 162-26, 162-28 and 392-172-308 of the Washington Administrative Code as they derive from the same nucleus of operative facts as the plaintiffs' federal claims. This Court has jurisdiction over the Plaintiff's Request for Injunctive Relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4.      Venue is proper in this Court as all actions and allegations occurred in Yakima County in the Eastern District of Washington.

### III. PARTIES

5.      Plaintiff José Garcia is an 18-year-old Mexican American man with a bilateral hearing impairment.  At all pertinent times, José Garcia was a special education student enrolled in the Grandview School District.

6.      Plaintiff Maria Sanchez is the Parent of José Garcia.  She was born

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 3 of 13

in a rural village in Mexico and had no formal education in Mexico. She is mono-lingual Spanish. She is illiterate in both Spanish and English.

7.    Defendant Grandview School District No. 200 is located in Yakima County, Washington and is fully accredited as a provider of educational services by the Washington State Board of Education pursuant to RCW 28A.305.130 and WAC 180-55-010, et seq. Pursuant to RCW 28A.320.010 school districts such as the Grandview School District, are corporate bodies that possess all the usual powers of a public corporation which may sue, be sued and transact all business necessary for maintaining and protecting the rights of the school district. Actions may be maintained against school districts for injuries to the rights of plaintiffs arising from their acts or omissions. RCW 4.08.120.

## IV. FACTS

8.    Plaintiff José Garcia is an 18-year-old high school student. He has suffered from sensorineural hearing loss since birth.

9.    José Garcia began attending developmental preschool in the District during 1996; he has never received services from another school district.

10.    Assessment and testing by both District and non-District qualified experts over the course of many years determined that José Garcia has average or normal cognitive functioning. He has no cognitive deficit or learning disability

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 4 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

which would prevent him from accessing a general education curriculum. Despite this, from kindergarten through the eighth grade, the District placed José Garcia in self-contained classrooms that included severely disabled students receiving basic life-skill instruction and students with cognitive impairments. The Administrative Law Judge concluded that there was a period of many years during first through eighth grades when, had José Garcia been provided a free appropriate public education, he would have been able to participate as a general education student. The Administrative Order concluded that the District denied José Garcia a free appropriate public education by failing to place him in the least restrictive educational environment.

11.    Beginning in kindergarten, José Garcia's individualized educational program ("IEP") determined he should receive speech services for a total of 40 minutes each week. The amount of speech service minutes never varied from kindergarten through the eleventh grade. The District's service logs do not establish that the District provided 40 minutes each week in conformity with his IEPs. The Administrative Law Judge concluded that the District failed to implement José Garcia's IEPs and thereby denied José Garcia a free appropriate public education.

12.    IEPs for José Garcia indicated the District would provide an FM

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 5 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

system as assistive technology.  In order for an FM system to function properly with José Garcia's hearing aids, a licensed clinical audiologist must calibrate the FM system and hearing aids to work together.  The District never had a licensed clinical audiologist calibrate any FM system for José Garcia to use with any of his hearing aids during the time he attended school in the District until January 2010, when José Garcia was in the 11th grade.  The Administrative Law Judge concluded that the failure to provided assistive technology contributed to José Garcia's failure to develop a viable communication system.  The District's failure also denied José Garcia a free appropriate education.

13.    The District failed to conduct IEP meetings in accordance with the IDEA and failed to include Maria Sanchez in educational planning for José Garcia, going so far as to falsely document meetings that did  not take place.  The Administrative Law Judge found that the District's procedural violations significantly impeded the Parent's opportunity to participate in the decision-making process and caused a denial of a free appropriate education.  The Administrative Law Judge also found that the District did not include Maria Sanchez as a part of the team planning her son's educational program and this also denied José Garcia a free appropriate public education.

14.    José Garcia did not make meaningful progress in the District.  He

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 6 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352
TEL. 509.946.5200 • FAX 509.946.2411

performs far below his age group in all academic areas and faces a bleak future. The Administrative Law Judge found that the District failed to include some form of systematic signing training in a signing system and this failure violated the IDEA and denied José Garcia educational benefit.

15.    The District failed to provide any transition planning for José Garcia.  The Administrative Law Judge found that this was a substantive violation of the IDEA and concluded that the District's failure denied José Garcia a free appropriate public education.

16.    On December 14, 2009, Maria Sanchez requested an Independent Educational Evaluation (IEE) for her son, José Garcia.  The District neither paid for an IEE, nor requested a hearing to contest her request.  Maria Sanchez then obtained an IEE at her own expense and requested reimbursement from the District.   The Administrative Law Judge concluded that Maria Sanchez was entitled to reimbursement from the District for the costs of an IEE.

17.    In high school, José Garcia's feelings of frustration, isolation and anxiety connected with his school experience increased to the point where he must now take medications to control symptoms of depression and anxiety.  All torts arising from the District's acts and omissions will be brought before this court in a separate action as a tort claim.

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS - 7 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

18.    By administrative order dated October 13, 2010, Administrative Law Judge Matthew Wacker found that the District's failure to provide an appropriate program and placement for Plaintiff José Garcia denied him his right to the free and appropriate public education guaranteed him by federal and state special-education laws and regulations and ordered the District to provide the Plaintiff with adequate compensatory education.  See Exhibit 1: Findings of Fact, Conclusions of Law and Order issued by Administrative Law Judge Matthew Wacker on October 13, 2010 in Special Education Cause 2010-SE-0008.

19.    The ALJ directed the District to contract with two identified experts, both recognized in the field of education, to develop and implement an appropriate educational program for José Garcia within 60 days of the October 13, 2010 order. The District was fully aware of the Order, but intentionally failed to meet its obligations through a series of delay and stalls tactics.  The actions of the District were in bad faith and intended to further deprive Plaintiff José Garcia of his right to a free appropriate education.  The Plaintiffs have sought the assistance of the Office of Superintendent of Public Instruction and the U.S. Department of Education, Office for Civil rights, each to no avail.

20.    To date, the District has failed to contract with the identified experts and has also failed to develop and implement an appropriate educational program

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 8 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

for José Garcia.

21.    Due to his hearing impairment, Plaintiff José Garcia needs specialized instruction in order to obtain any educational benefit.

22.    The District knew or should have known that José Garcia was improperly denied special education and related services during the many years he attended school in the District.

23.    The District took affirmative steps to exclude the Parent Maria Garcia from full participation in the development of her son's special education program.

24.    As a result of the District's acts and omissions, José Garcia has and will suffer pain, mental anguish and emotional distress, for which a separate action will be filed, however, José Garcia has, and will continue to suffer irreparable harm.

25.    As a result of the District's acts and omissions José Garcia has lost educational opportunities and will lose future earning capacity.

26.    As a result of the District's acts and omissions José Garcia's emotional, educational and psychological states have deteriorated from the time he enrolled in the Grandview School District until the present time and without relief will continue to deteriorate.

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 9 of 13

**FEENEY LAW OFFICE PLLC**
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 • FAX 509.946.2411

27.   Plaintiffs will file additional documents and declarations to support this complaint.

## V.  CLAIMS FOR RELIEF

### A.   Denial of Special Education Rights

28.   The IDEA requires that school districts provide students with a free, appropriate public education including special education and related services.

29.   The District violated the IDEA by denying Jose Garcia a free appropriate public education and special education-related services and by violating the procedural and substantive requirements of the IDEA.

30.   The District further violated the IDEA by failing to modify the Student's IEP in order to provide appropriate educational services in accordance with the order of the administrative law judge assigned by the Office of Superintendent of Public Instruction to hear and decide the matter.

### B.   Denial of Equal Educational Opportunity under the Washington Constitution

31.   The factual allegations set forth above are hereby all alleged and incorporated by reference.

32.   Grandview School District, through its administrators, agents and employees, intentionally, negligently, or with deliberate indifference failed to

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTION RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 10 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352
TEL. 509.946.5200 • FAX 509.946.2411

follow the Order of the Administrative Law Judge pertaining to the design and implementation of an educational program and placement for the Student within 60 calendar days of entry of the administrative order.    The District is therefore in violation of the Washington State Constitution Article IX § 1 providing for non-discriminatory access to an education for all students living in the state of Washington.

33.    By denying José Garcia nondiscriminatory access to his education as of December 13, 2010, Jose Garcia has been and currently is being denied equal educational opportunities under Washington State Constitution Article IX § 1.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs seek the following **DECLARATORY AND INJUNCTIVE RELIEF**:

A    That the Court assume jurisdiction during the pendency of this matter; and

B.    A declaratory judgment that the Grandview School District violated the Individuals with Disabilities Act, 42 U.S.C. §§ 1401 *et seq.* by failing to follow the administrative order issued October 13, 2010 that directed the District to develop and implement a program and placement for Plaintiff José Garcia within 60 days and thereby further denying Plaintiff José Garcia a free appropriate

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington 99352
TEL. 509.946.5200 ● FAX 509.946.2411

education.

C.    That the Court order the Grandview School District, through its administrators, agents, and employees, to immediately comply with the Administrative Order specific to contracting with the education experts identified in the Order to develop and implement an educational program for José Garcia; and

D.    A monetary judgment requiring the Defendant to pay the Plaintiffs $2000 per day from December 14, 2010 up to the date the District complies with the Administrative Order pertaining to the development and implementation of an appropriate program and placement for Plaintiff José Garcia.

E.    A monetary judgment requiring the Defendants to pay the plaintiffs' reasonable attorney fees and costs incurred in pursuing this action.

F.    Any and all other relief as the Court may deem just and equitable.

RESPECTFULLY SUBMITTED this 16th day of December, 2010.


FEENEY LAW OFFICE, PLLC


By _____
Kerri W. Feeney, WSBA #34080
Margaret Bridewell, WSBA #20903
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
FEES AND COSTS  - 12 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352
TEL. 509.946.5200 • FAX 509.946.2411

Telephone:  (509)  946-5200
Facsimile:  (509)  946-2411
Email:  kfeeneylaw@frontier.com
Email:  Mbridewell-law@frontier.com

GRANT & ASSOCIATES
    Artis C. Grant Jr., WSBA #26204
    3002 S. 47th Street
    Tacoma, Washington  98409-4416
    Telephone: (253) 472-6213
    Facsimile:  (253)  473-9695
    Email:  agrant@lawdome.com

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, DAMAGES AND ATTORNEY
 FEES AND COSTS  - 13 of 13

FEENEY LAW OFFICE PLLC
1177 Jadwin Avenue, Ste. 104
Richland, Washington  99352
TEL. 509.946.5200 • FAX 509.946.2411

# EXHIBIT 1



MAILED

OCT 13 2010

SEATTLE-OAH

**STATE OF WASHINGTON**
**OFFICE OF ADMINISTRATIVE HEARINGS**

*One Union Square Suite 1500 • 600 University Street • Seattle WA 98101*
*(206) 389-3400 • (800) 845-8830 • FAX (206)587-5135 • www.oah.wa.gov*

October 13, 2010

Parents

Diann Zavala, Special Programs Director
Grandview School District
913 W 2nd St
Grandview, WA 98930

Kerri W. Feeney, Attorney at Law
Margaret Bridewell, Attorney at Law
Feeney Law Office PLLC
MacHunter Building
1177 Jadwin Avenue, Ste. 104
Richland, WA 99352

Joni Kerr, Attorney at Law
800 NE Tenney Rd., Suites 110-123
Vancouver, WA 98685

Artis Grant, Attorney at Law
Grant & Associates
3002 S 47th Street
Tacoma, WA 98409-4416

**In re:  Grandview School District - Special Education Cause No. 2010-SE-0008**

Dear Parties:

Enclosed please find the Findings of Fact, Conclusions of Law, and Order in the above-referenced matter. This completes the administrative process regarding this case. Pursuant to 20 USC 1415(i) (Individuals with Disabilities Education Act) this matter may be further appealed to either a federal or state court of law.

After mailing of this Order, the file (including the exhibits) will be closed and sent to the Office of Superintendent of Public Instruction (OSPI). If you have any questions regarding this process, please contact Administrative Resource Services at OSPI at (360) 725-6133.

Sincerely,

MATTHEW D. WACKER
Administrative Law Judge

cc:      Administrative Resource Services, OSPI
         OAH/OSPI Caseload Coordinator

*15*

STATE OF WASHINGTON
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION

MAILED
OCT 1 3 2010
SEATTLE - OAH

| | |
|---|---|
| IN THE MATTER OF:<br><br>GRANDVIEW SCHOOL DISTRICT | SPECIAL EDUCATION<br>CAUSE NO.  2010-SE-0008<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER** |

A hearing in the above-entitled matter was held before Administrative Law Judge (ALJ) Matthew D. Wacker in Grandview, Washington, on May 24-26, June 21, July 12-16, July 19-21, July 23, August 10-13 and August 25-26, 2010.  The Parent of the Student[1] whose education is at issue appeared and was represented by Kerri Feeney, Margaret Bridewell and Art Grant, attorneys at law. The Grandview School District (District) appeared through Diann Zavala, special programs director, and was represented by Joni Kerr, attorney at law.[2]  Also present was Sharon Yedidia, Washington court-certified Spanish interpreter, who provided interpretation of the due process hearing for the Parent.

## STATEMENT OF THE CASE

### Procedural History

The Parent filed a Due Process Hearing Request (the Complaint) with the Office of Superintendent of Public Instruction (OSPI) on January 15, 2010, which was assigned Cause No. 2010-SE-0008.  The Complaint was forwarded to the Office of Administrative Hearings (OAH) for assignment of an ALJ.  A Scheduling Notice was entered January 20, 2010.

Multiple prehearing orders were entered, including the following:  A prehearing order was entered March 25, 2010, bifurcating the due process hearing.  The first part of the bifurcated hearing was limited to the issue of whether the Parents could establish either of the two statutory exceptions to the statute of limitations in the Individuals with Disabilities Education Act (IDEA).  On April 7, 2010, a prehearing order was entered, setting the first part of the bifurcated hearing for May 5 through May 7, 2010.  After substitution of counsel for the District, a prehearing order was entered May 4, 2010, continuing the first part of the bifurcated hearing to May 24-26, 2010.  An Interlocutory Order on Statue of Limitations was entered June 11, 2010.

---

[1] In the interest of preserving the family's privacy, this decision does not identify by name the parent(s), student or family members.  Instead, they are identified as "Parent(s)" and "Student."  Siblings will be identified as Sister or Brother as needed.  Unless otherwise expressly noted, "Parent" will be used to identify the Mother of the Student.

[2] Kevin Chase, District superintendent, appeared in place of Ms. Zavala for part of August 12, 2010.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

16

## Evidence Relied Upon

Exhibits Admitted:

**Parent's Exhibits** P1 - P42, P47 - P48, P49, pp. 7 - 51 only, P50 - 51, P55, pp. 1-8 and pp. 15-16 only, P56 - P60, P61, p. 2 paragraph 2 only, P63 - P65, P66, with the following limitation: no portion of the deposition shall be considered which expresses any opinion of the deponent which is based upon information the deponent received *at* the deposition, P67, excluding redaction on p. 2, P68 - P73, except that first sentence of paragraph 15 and the second sentence of paragraph 33 is stricken, P75 - P77, P79.

**District's Exhibits** D1 - D9, D11- D16, D23 - D26, D28, D29, pp. 1-4, p. 6, pp. 8-12, pp. 19-25, pp. 27-28 only[3], D37 - D40.

**Court's Exhibit C1**

Witnesses Heard (in order of appearance):

**Sherry Mashburn**, Parents Are Vital In Education (PAVE) parent advocate.
**The Student's Sister**.
**Diann Rockstrom**, Educational Service District (ESD) 105 teacher of the deaf/hard of hearing.
**Diann Zavala**, District special programs director.
**The Parent**.
**Wendy Marlowe**, Ph.D., neuropsychologist.
**Jennifer Tucker**, District middle school self-contained classroom special education teacher.
**Maria Cadengo**, District special education paraeducator and interpreter
**Maria Fisher**, District assistant secretary for student assessment.
**Elizabeth Ice**, District high school resource classroom special education teacher.
**Carl Fields**, M.D., the Student's personal physician.
**Girlfriend** of the Student's Brother.
**Barbara Luetke**, Ph.D., deaf education/bilingual education, administrator for Northwest School for Hearing Impaired Children (NWSFHIC).
**Barbara Merz**, District speech and language pathologist (SLP).
**Joseph West**, M.A., former District school psychologist.
**Carol Carrothers**, state coordinator, deaf and hard of hearing services, Washington Sensory Disabilities Services.
**Julia Coe**, Au.D., staff audiologist, Yakima Hearing and Speech Center (YHSC).
**Jennifer White**, educational and vocational consultant
**Thora Michels**, former District special programs director (retired).
**Anne Lundy**, District preschool/developmental kindergarten special education teacher.
**Elizabeth Jensen**, former District high school general education English teacher.

---

[3] The Parent objected to proposed Exhibit D29, pp. 29-38. The ALJ reserved ruling on those pages. After review and consideration, the objection is sustained and proposed Exhibit D29, pp. 29-38 are excluded.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 2

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

**Trudy Sylling**, District elementary school self-contained classroom special education teacher.
**Richard Lang**, R.N., District school nurse.
**Lenor Aguilar**, District SLP secretary and interpreter.
**Patrick Walsh**, M.A., former District school psychologist (retired).
**Travis Rundell**, former District SLP (retired).
**Jeff Sevigny**, District high school general education teacher.
**Virginia Frances**, Ph.D., District school psychologist.
**Irma Gonzalez-Ramos**, District high school counselor.
**Rick Ramos**, District high school special education teacher.

## District's Motion for Reconsideration of Interlocutory Order on Statute of Limitations

The due process hearing was bifurcated to first hear and decide the issue of whether the Parent could establish either of the two statutory exceptions to the statute of limitations in the IDEA. After three days of hearing, it was concluded the Parent proved the District withheld information it was required to provide the Parent, thereby establishing one of the exceptions to the two-year statute of limitations. *See* June 11, 2010, Interlocutory Order on Statute of Limitations. On June 21, 2010, the District made an oral motion for reconsideration of the Interlocutory Order, requesting the ALJ consider additional evidence as the record was developed during the second part of the bifurcated hearing on the merits of the Parent's Complaint. The District's motion was taken under advisement. The District's Post-Hearing Brief made further argument for reconsideration of the Interlocutory Order.

The Parent and the District were provided clear and express notice that the first part of the bifurcated hearing was the parties' opportunity to present whatever evidence either party had on the statute of limitations issue. The purpose of bifurcating the hearing to decide the statute of limitations issue was equally clear. Resolution of the issue would have a profound impact on the duration, complexity and resources necessary to adjudicate the merits of the Parent's Complaint. Absent identification of some compelling circumstance or event which effectively prevented a party from presenting relevant evidence at the first part of the bifurcated hearing, no additional evidence warrants consideration. The District's Post-Hearing Brief references testimony by multiple District witnesses from the second part of the bifurcated hearing. However, there is no apparent reason why these witnesses could not have been called during the first part of the bifurcated hearing. The District's Post-Hearing Brief cited case law in support of reconsidering the Interlocutory Order. That case law, however, predated the adoption of an express statute of limitations in the 2004 IDEA Amendments, and was not directly on point. The District's motion for reconsideration is denied.

## District's Motion to Dismiss

Upon close of the Parent's case in chief at the due process hearing, the District moved for dismissal of multiple issues raised in the Complaint. The District asserted the Parent failed to produce any evidence such that the District was entitled to dismissal of the issues as a matter of law. Given the scope and quantity of evidence to consider and the necessity for detailed review, the District's motion was taken under advisement. After careful review of the evidence of record as of the close of the Parent's case in chief, it is concluded the Parent produced sufficient evidence to

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX (206) 587-5135

*18*

raise genuine issues of material fact sufficient to defeat the motion to dismiss. The District's motion for dismissal is denied.

## District's Motion to Strike Parent's Closing Argument

On June 1, 2010, the District filed a Motion to Strike Parent's Closing Argument (Motion). On June 2, 2010, the Parent filed a Response to the Motion (Response). After review of the Motion and Response, the Motion is denied.

## ISSUES

As set forth in the March 18, 2010, Prehearing Order, the issues for the due process hearing are:[4]

a.    Whether the District has denied the Student a free appropriate public education (FAPE) from the commencement of the 1998-1999 school year (kindergarten) through January 15, 2010, by:

    i.    Failing to provide the Student with appropriate programs and placements in the least restrictive environment (LRE) when the District:

        (1)    Placed the Student in a self-contained classroom with nonverbal and mentally impaired students, and;

        (2)    Did not provide the intensive speech-language instruction the Student required in order to develop effective communication skills, and;

        (3)    Did not include the Parents in the individualized education program (IEP) team when it determined the Student's educational placement, and;

        (4)    Based its 2002 reevaluation of the Student entirely on a review of previous reports, and;

        (5)    Changed the Student's eligibility category without any data to support the change, and;

---

[4] The March 18, 2010, Prehearing Order did not identify the period at issue for any denial of FAPE because the period at issue was the subject of a prehearing motion which ultimately led to bifurcation of the due process hearing. The period at issue was determined by the Interlocutory Order on Statute of Limitations entered June 11, 2010. The statement of the issues is revised to include the period at issue consistent with the Interlocutory Order.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 4

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX (206) 587-5135

*19*

(6)    Changed the Student's placement during **ninth**[5] grade by moving the Student in and out of a self-contained classroom to a general education classroom without amending the Student's IEP to reflect the changes in placement, and;

(7)    Failed to include input from appropriate instructors in the Student's 2008 evaluation, and;

ii.    Failing to provide supplementary aids and services when the District;

(1)    Did not provide the intensive speech-language instruction the Student required in order to develop effective communication skills, and;

(2)    Failed to provide the Student with an FM system until after the Student was in the eleventh grade, and;

(3)    Informed the educational service district (ESD) teacher of the deaf that the Student did not require any services, and;

(4)    Failed to provide the Student with the support services he required in order to succeed when the District placed the Student in a general education classroom during the **ninth**[6] grade, and;

iii.    Failing to allow the Parents meaningful participation in the educational process when the District;

(1)    Did not provide written materials to the Parents in their native language, and;

(2)    Did not provide certified Spanish interpreters for IEP and other meetings, and;

(3)    Predetermined the Student's IEPs, and;

(4)    Did not consider Parental input during development of the Student's IEPs, and;

(5)    Misrepresented the Student's progress to the Parents, and;

---

[5] The March 18, 2010, Prehearing Order identified the Student's *eighth* grade as the school year when the changes in placement occurred. After review of the record, it is clear the changes in placement occurred during the Student's ninth grade school year (2007-2008). The statement of the issues is corrected to reflect the ninth grade.

[6] The record is clear the Student was placed in a self-contained classroom from at least first through eighth grades. The Student was never placed in a general education classroom until the ninth grade. The statement of the issues is corrected to reflect the ninth grade.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 5

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX (206) 587-5135

iv.   Failing to provide appropriate instruction to allow the Student to progress academically when the District;

    (1)   Did not provide sign language instruction to the Student, and;

    (2)   Did not provide extended school year (ESY) services to the Student, and;

v.   Failing to provide transition planning for the Student;

b.   And, whether the Parents are entitled to their requested remedies:

i.   An independent educational evaluation at public expense for the Student conducted by a licensed professional selected by the Parents, who is not affiliated with the District and who has special knowledge of educational programming for deaf children, and;

ii.   Payment by the District of all costs for an appropriate private educational placement and program for the Student, and;

iii.   Provision of compensatory education services to the Student, specific services to be determined, and;

iv.   Payment by the District of all litigation costs, including expert witness fees and attorneys' fees incurred in connection with the due process proceeding and any subsequent related appellate and/or litigation processes,

v.   Or other equitable remedies, as appropriate.

## FINDINGS OF FACT

### Credibility of Witnesses

1.   Rick Ramos has been employed by the District as a high school special education teacher beginning with the 2008-2009 school year.  Prior to that, Mr. Ramos was employed by the District as a paraprofessional in a self-contained classroom for one year.  In addition to his duties as a high school special education teacher, Mr. Ramos is a case manager for students at the high school who are eligible to receive special education and related services.  In this capacity, Mr. Ramos is responsible for coordinating development of annual IEPs for the students on his case load.

2.   Mr. Ramos was the Student's case manager for the 2008-2009 and 2009-2010 school years, and was responsible for coordinating development the Student's IEPs for those two years.  As part of his responsibilities, Mr. Ramos drafted the Student's IEPs and attended and coordinated the IEP team meetings.

3.   Mr. Ramos drafted the Student's IEP in October 2008. Exhibit P41. Mr. Ramos met with the Parent and the Student's Sister to review the IEP.  The Sister, Parent and Mr. Ramos all signed the

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 6

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

21

IEP. Exhibit P41, p. 13. After meeting with the Parent and the Sister, Mr. Ramos took the IEP to other members of the IEP team, "explained" to those individuals what happened at the meeting between Mr. Ramos and the Parent, and had the other IEP team members sign the IEP. Mr. Ramos used this same procedure for the Student's October 2009 IEP. Exhibit P42. Mr. Ramos' testimony is consistent with the Parent's and Sister's testimony that they did not meet with anyone other than Mr. Ramos with respect to these two IEPs, and that at the time they signed the IEPs there were no signatures on the IEPs except for their own and Mr. Ramos' signature.

4.    The IEP forms state directly above the signatures lines, "PARTICIPANTS IN IEP MEETING (Parental signature does not constitute agreement or disagreement)." Exhibits P41-42.

5.    None of the IEP team members whose signatures appear below Mr. Ramos' signature on the Student's two IEPs ever attended an actual meeting to participate in the review and development of the Student's IEPS during these two school years. These IEP team members include Irma Gonzalez-Ramos, Thora Michels, Jeff Sevigny and Barbara Merz. Exhibits P41, p. 13, P42, p. 11.

6.    Rick Ramos and Irma Gonzalez-Ramos are husband and wife. Ms. Gonzalez-Ramos testified at hearing that if her signature appeared on an IEP, she was present at the IEP team meeting. This is clearly false testimony.

7.    The fact these IEP team members signed the IEP(s), attesting they participated in the IEP meeting(s) when in fact they did not, severely erodes the credibility of these witnesses at hearing. It is found that the testimony of witnesses Irma Gonzalez-Ramos, Thora Michels, Jeff Sevigny and Barbara Merz is generally not credible. Any findings of fact based in any part upon the testimony of these witnesses is limited to findings which are supported by testimony which is construed as statements against interest, which is found to be more reliable and credible than self-serving testimony.

8.    Mr. Ramos testified he met with the Parent and the Student's Sister on the evening of October 5, 2008, at the Student's high school to review the Student's IEP. Exhibit P41. October 5, 2008, was a Sunday. The Parent and the Student's Sister testified they never met with Mr. Ramos at the high school on a Sunday evening. The testimony of the Parent and the Sister is found more credible than Mr. Ramos' testimony. This finding is based in part upon the logical persuasiveness of the witnesses' testimony, i.e. it is less believable school staff would meet with parents on Sunday evenings, as well as Mr. Ramos' practice, set out above, where he collected individuals signatures on documentation stating the individuals had attended IEP meetings when in fact they had not. As with the witnesses identified in Finding of Fact 7, it is found that Mr. Ramos' testimony is generally not credible.

## General Background

9.    The Parent was born in a rural village in Mexico, and had no formal education in Mexico. The Parent is mono-lingual, and speaks only Spanish. The Parent immigrated to the United States in 1980. The Parent has not had any formal education in the United States. The Parent cannot speak, read or write English, which the exception of being able to sign her name in English. The Parent is also unable to read or write in Spanish. The Parent is illiterate in both Spanish and English. Over

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 7

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

22

the course of many years, the Parent has told many District staff she cannot read or write in Spanish.

10.   Although unsure as to the exact time, Thora Michels, then District special programs director, came to learn the Parent was illiterate in both Spanish and English.  Ms. Michels learned this approximately 5 to 10 years ago from working with District teachers and school psychologists.  Ms. Michels was the District's special programs director for 15 years until her retirement in June 2009. During her tenure as special programs director, the District never had a staff member who was a deaf/hard of hearing (DHH) teacher.

11.   The Student has resided within the District during all times material to resolution of the issues herein.  The Student began attending developmental preschool in the District during 1996.  The Student is presently attending twelfth grade in the District. The Student has always attended District schools; the Student has never received educational services from another school district.

12.   Assessment and testing by both District and non-District qualified experts over the course of many years determined the Student has average or normal cognitive functioning.  The Student has no cognitive deficit or learning disability which would prevent him from accessing a general education curriculum.

13.   The Student was born hearing impaired.  He has sensori-neural hearing loss that precipitously slopes from a mild to profound hearing loss from 500 Hz - 8000 Hz bilaterally.  The Student's hearing loss is stable.  The Student was fit with bilateral hearing aids (HAs) between 7 and 12 months of age.  The Student HAS a history of difficulty with discomfort when using his HAs. Historically, the Student has been difficult to fit with HAs.  Exhibit P56.

14.   Without the benefit of HAs the Student is able to hear a few vowel sounds.  However, the majority of consonants sounds are located at higher frequencies, where the Student has severe to profound hearing loss.  Testimony of Julia Coe.

15.   The Student's hearing loss is such that he has a very difficult time hearing even the basic vowels and voiced consonants.  The Student is unable to hear any speech elements that are produced without voicing, so-called "voiceless sounds," like /s/, /p/, /h/, /th/, /sh/, /ch/, /f/, /h/, /wh/ and /k/.  Exhibit P15, p. 19.

16.   Over the course of many years, the Student HAs been described by District staff as a "wonderful kid," with a sense of humor who HAs worked hard in class.  Testimony of Jennifer Tucker.  The Student worked hard and did his assignments.  Testimony of Elizabeth Jensen.  The Student was well-behaved and eager to learn.  Testimony of Trudy Sylling.  Carol Carrothers, who volunteered her time to tutor the Student during the summer of 2009, described the Student as eager to learn.  The Student put thought and effort into the homework Ms. Carrothers assigned, and completed all his homework. Testimony of Carol Carrothers. The Student is described in IEPs as having "great behavior and hard working attitude," and "is a very polite student who works hard in school."  Exhibits P40, p. 2, P32, p. 5.

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  8

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

## Provision of SLP Services to the Student

17.   The Student's November 1998 (kindergarten) IEP determined the Student should receive speech services for 20 minutes, twice a week, for a total of 40 minutes per week. Exhibit P12; p. 3.

18.   From 1998 in kindergarten through the 2009-2010 school year, the Student's IEPs never changed with respect to the amount of time the Student was to receive SLP services. Every one of the Student's IEPs called for 40 minutes per week of SLP services. See e.g., Exhibits P17-P19, P21, P24, P26, P32, P33, P39, P41, P42.

19.   All SLP services were provided by SLP aides. The SLP aides were trained and supervised by SLPs Travis Rundell and Barbara Merz. All SLP services provided to students in the District were recorded on Speech Professional Service Logs. The SLP aides were directed to fill out the service logs, including the date and type of service provided, a description of the treatment, an evaluation of the progress the student demonstrated using a progress key of 0-5, where 0 indicated measurable progress was not seen and 5 indicated mastery of short-term objectives, and treatment length. However, Lenor Aguilar, former SLP aid who provided services to the Student during at least part of two school years, was instructed to make no entry in the progress column if a student did not make observable progress.

20.   The SLP services logs for the Student are Exhibit P43. After careful review of the service logs, it is concluded they are not credible or reliable records sufficient to establish the District in fact provided 40 minutes of SLPs to the Student each week in conformity with the Student's IEPs. Again and again the service logs are incompletely filled out, lacking complete dates for services provided, Student's name, service provider's name and/or signature, supervisor's signature, or any indication of progress according to the Progress Key which appears at the bottom of each log sheet. There are service logs where there is absolutely no information which can be used to identify who provided or received the services allegedly reflected on the log. See, e.g. Exhibit P43, pp. 16 and 18.[7]

## Provision of FM Amplification System for the Student

21.   The Student's November 1998 (kindergarten) IEP contains a section entitled;

**Communication Needs**-Describe any communication needs of the child and *in the case of a child who is deaf or hard of hearing*, consider the child's language and communication needs; opportunities for direct communication with peers and professional personnel in the child's language and communication mode; academic level; and full range of needs, including opportunities for direct instruction in the child's language and communication mode:

---

[7] Furthermore, were the service logs determined credible and reliably sufficient to establish the District provided the services required in the Student's IEPs, the inevitable conclusion to be drawn from the logs is that with the exception of two or three 20 minute sessions, the Student made no measurable progress during any of the hundreds of SLP service sessions over a period of many years.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 9

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

24

Exhibit P12, p. 11.

The only notation in this section is "NA."

22.    The same IEP contains a section entitled "Assistive Technology Devices and Services," and requires a description of any assistive technology devices or services needed.  The only notation in this section is "NA."  Exhibit P12, p. 11.

23.    The District carried out an evaluation of the Student which was completed on February 3, 1999.  The evaluation noted the Student's hearing impairment and language development deficient, and recommended, in part, that he needed hearing aids or other hearing amplification such as a teacher/student amplified communication system.  Exhibit P15, p. 4.  The District's evaluation determined the Student continued to require speech therapy for a minimum of 40 minutes per week.  Exhibit P15, p. 10.

24.    A District Audiometric Evaluation of the Student conducted on February 10, 1999.  The Evaluation determined the educational impact of the Student's hearing acuity was such that;

> [The Student] will have a very difficult time hearing even the basic vowels and voiced consonants...It is very important that [the Student] have an amplification system to maximize his educational opportunities...Ambient noise will severely effect [the Student's] ability to perceive and distinguish auditory input.

Exhibit P15, p. 19.

25.    The Audiometric Evaluation recommended amplification to maximize the Student's auditory input, and manual signing to augment his educational program.  Exhibit P15, pp. 19-20.

26.    On February 24, 1999, a multi-disciplinary team (MDT) meeting was held to review the Student's evaluation.  The MDT documented the Student's need fo specially designed instruction, including amplification and manual communication.  Exhibit P16, p. 4.  The MDT recommended 40 minutes per week of speech and language therapy and an in-class FM amplification system until hearing aides are updated.  Exhibit P16, p. 5.

27.    The Student's IEP team met on October 29, 1999, to develop a new IEP for the Student.  Exhibit P17.  The Student's new IEP did not identify or contain any reference to an in-class FM Amplification system for the Student.

28.    The Student attended Jennifer Tucker's seventh grade self-contained special education classroom during the 2005-2006 school year.  The Student did not wear his HAs during most of seventh grade.  When he stopped wearing his HAs in seventh grade, the Student complained to Ms. Tucker that his HAs "hurt" when he wore them.  Testimony of Jennifer Tucker.

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  10

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

25

29.   On December 12, 2001, District SLPs Barbara Merz and Travis Rundell sent a memo or correspondence to the school nurse, school psychologist and the Student's third grade teacher, Trudy Sylling.  In the memo, SLPS Merz and Rundell state;

> It must be remembered that a hearing aid is basically a microphone not (sic) matter how loud we attempt to make the voiceless speech phonemes they are still produced "without voice".

> The following phonemes are produced without voice. [The Student] will not be able to hear these speech sounds even when his hearing aid(s) are functioning correctly.

> /s/, /sh/, /ch/, /t/, /f/, /p/, voiceless /th/ /k/ and /h/.

> Not hearing these sounds impacts not only speech production but reading and spelling as well.

Exhibit P20, p. 2.

30.   The District reevaluated the Student during January 2002.   The Evaluation Report recommended the Student have preferential seating, signing training, and an amplification system for his hearing.  Exhibit P22, p.11.

31.   The Student was attending third grade in Trudy Sylling's self-contained classroom during the 2001-2002 school year. Ms. Sylling did not pursue the recommendations for signing training or an amplification system because the Student was "self-conscious" about these tools.  Testimony of Trudy Sylling.

32.   The Student's IEP team met on October 18, 2002, to develop a new IEP for the Student. The IEP team had annual goals and objectives prepared by one or more of the District SLPs to consider as part of the IEP process. The Statement of Present Levels of Performance for the SLP goals and objectives stated, in part, "[the Student] has been very good about wearing his hearing aids but most of this year he has not had batteries for them so has missed lots of what was going on in class and in therapy."  Exhibit P21, p. 4.  There is no consideration or discussion of the Student using an amplification system for his hearing in the IEP.

33.   The Student's IEP team met on October 9, 2003, to develop a new IEP for the Student. The IEP team had annual goals and objectives prepared by one or more of the District SLPs to consider as part of the IEP process. The Statement of Present Levels of Performance for the SLP goals and objectives stated, in part, "[the Student] has a severe bilateral hearing loss and is wearing bilateral aides (sic). His speech is becoming more monotone as time goes on.  He is depending more and more on speech reading to determine what the speaker is saying."  Exhibit P24, p. 6.  There is no consideration or discussion of the Student using an amplification system for his hearing in the IEP.

34.   The Student's IEP team met on October 7, 2004, to develop a new IEP for the Student. Exhibit P26, p. 4.  There is no consideration or discussion of the Student using an amplification system for his hearing in the IEP.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

26

35.    The District reevaluated the Student during January 2005. SLP Travis Rundell assessed the Student's speech and language skills.  Mr. Rundell noted that;

> Because of not wearing his aids all of the time his [the Student's] speech is becoming even more monotone and difficult to understand.  Articulation errors that he has are because he does not wear his aid all the time.  His articulation skills are at the severe level.  Language continues to be delayed in both expressive and receptive skills.

Exhibit P28, p. 8.

36.    Mr. Rundell's assessment of the Student's speech and language skills does not discuss or consider the use of any amplification system for the Student.

37.    The Student's IEP team met on October 7, 2005, to develop a new IEP for the Student.  There is no consideration or discussion of the Student using an amplification system for his hearing in the IEP.  Exhibit P32.

38.    The Student's IEP team met on October 6, 2006, to develop a new IEP for the Student. SLP Rundell completed SLP goals and objectives for the IEP.  Mr. Rundell noted;

> Today he [the Student] was not wearing his aids.  He said he did not know where they were.  The teacher has one of his aids and stated that it was broken.  In fact it had gone through the washing machine.  The other aids (sic) location is unknown. [The Student] need to go to the Hearing and Speech Center and have his hearing reevaluated and try to have his hearing aids repaired on (sic) new one if that is the recommendation.  In the mean time it is recommended that he use an FM system.

Exhibit P33, p. 14.

39.    On January 30, 2008, District SLP Merz assessed the Student's speech and language skills as part of a three-year reevaluation of the Student.  Ms. Merz noted;

> Today he [the Student] was not wearing his hearing aids when he entered the evaluation room; however, they were in his backpack...It is unlikely he wears them consistently during his instructional day.  His speech is becoming more difficult to understand since he is not wearing his aids consistently.

The assessment went on to state the Student;

> [D]oes not hear any voiceless phonemes even with amplification.  Therefore, his speech distorts many of these speech sounds.  He does not hear most vowel sounds and the lower range of consonants.

The assessment went on to state the Student;

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  12

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

[M]isarticulated the following phonemes in one or more positions in words: /f/, /t/, /s/, /p/, voiceless /th/, /h/, /sh/, /ch/, /k/, in addition he tends to confuse short vowel sounds. While he hears most vowel sounds he does not distinguish between them, such as the difference between the short /e/, /i/, and /a/ is so slight that her (sic) can not hear the difference.  This impacts the development of his reading and spelling skills.

Exhibit P37, pp. 12-13.

40.    On February 27, 2008, the Student's IEP was amended.  Exhibit P39.  One of the speech and language objectives/benchmarks is to "encourage [the Student] to wear his hearing aids and use the FM system every day at school."  Exhibit P39, p. 9.

41.    Some time early in the 2009-2010 school year, Ms. Merz and Diann Rockstrom, ESD 105 teacher of the DHH, took parts from each of the 3 District Comtek systems and were able to produce one functioning Comtek system.  Prior to that, none of the Comtek systems had been functional for the last 1½ - 2 years.

42.    On October 5, 2009, the Student's IEP team met to develop a new IEP for the Student.  One of the speech and language objectives/benchmarks is to "encourage [the Student] to wear his hearing aids and use the FM system every day at school."  Exhibit P42, p. 5.

43.    Between February 27, 2008, and October 5, 2009, Ms. Merz signed three IEPs for the Student as the District's SLP, while fully aware there was no functioning FM system in the District.  Exhibits P39, P40-P41.

44.    Over the course of the Student's entire period of attendance in the District from kindergarten until January 2010, the District had three FM amplification systems available for use by District students.  These were three Comtek FM systems, which are presently at least 15 years old, as they predated Ms. Michels tenure as special programs director.  These are wireless radio systems which operate generally as follows.  The teacher/instructor has a small microphone which is typically clipped or temporarily attached to clothing close to the face.  The microphone is attached to a small FM radio transmitter which can be carried around by the teacher on a belt or otherwise attached to clothing.  The FM transmitter emits a radio signal which is picked up by a receiver on or near the hearing impaired student in the class room.  Depending on the individual needs of the hearing impaired student, the receiver can be a small speaker which sits on the student's desk, a pair of headphones or earbuds the student wears, or the received can be connected directly to a student's hearing aids by means of a specialized interface or attachment called a "boot."  The Student's individualized need for sound amplification required the use of a boot to attach the FM system directly to his HAS.

45.    In order for an FM system to function properly with any HA, including the Student's HAs, a licensed clinical audiologist must calibrate the FM system and HAs to work together.  Neither Mr. Rundell or Ms. Merz are qualified to calibrate FM systems with HAs.

46.    The District never had a licensed clinical audiologist calibrate any FM system for the Student to use with any of his HAs during any time the Student has attended school in the District.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

28

47.   Although not completely clear because the District did not keep any written record or documentation identifying to whom or when the Comtek systems were assigned, during at least some period(s) of time the District provided one of the Comtek systems to the Student for his use. This included some period of time when the Student was in middle school in Jennifer Tucker's seventh and/or eighth grade classes.

48.   The District's Comtek systems are not compatible with the Student's HAs.  Testimony of Barbara Merz.  The Student would have to remove his HAs in order to attempt to use one of the Comtek systems.  Testimony of Julia Coe.  In fact, the Student removed his HAs and used the Comtek system with earbuds in Ms. Tucker's eighth grade class.  Testimony of Jennifer Tucker. It would be nothing more than a "guess" whether the Student received any benefit from use of one of the District's Comtek FM systems with or without his own HAs.  Testimony of Barbara Merz.

49.   Former District SLP Travis Rundell, now retired, offered testimony at hearing regarding the use and benefits of the Comtek systems for the Student. Mr. Rundell testified that in his opinion the Student could have used one of the Comtek systems without his HAs using headphone or earbuds and could have heard as well as if he was using his HAs. Mr. Rundell then testified that "at times" the District had boots that fit well with the Student's HAs, and during times when the District did not have boots the Student had an FM amplification system in his classroom. Mr. Rundell then admitted that matching boots to HAs requires the skill and training of a qualified audiologist, and that to his knowledge the District never had such a qualified audiologist match or fit boots for the Student's HAs.  It is found that Mr. Rundell's testimony is internally inconsistent and is contradicted by other credible evidence of record.  It is found that Mr. Rundell's opinions regarding the Student's use of and benefit from the Comtek systems is not credible.

## Student's Least Restrictive Environment

50.   The Student was evaluated for early intervention services when he was three years old in 1996. The Student was determined eligible under the category of developmental delay. The District was aware the Student had a hearing impairment, as well as communication delays. After the evaluation, the District recommended, and the Student attended, two half-days per week in a special education preschool program.  Exhibits P4 - P6, P58, p. 2.

51.   On or about May 26, 1998, the Parent was notified the Student qualified for enrollment in a developmental special education kindergarten for the 1998-1999 school year. The children in this program would attend a regular kindergarten class in the morning at McClure Elementary School, and then attend a developmental kindergarten at Harriet Thompson Elementary School in the afternoon.  Exhibits P11, P58, p. 2.

52.   The Student entered kindergarten for the 1998-1999 school year. The Student's IEP team considered multiple placement options, including a special education class with integration into general education class and/or community. This option was rejected as too restrictive. The IEP team determined the Student would attend regular (general education) kindergarten at McClure School in the morning and an extended kindergarten class at Harriet Thompson School three afternoons each week.  Exhibit P12, p. 5.

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page 14

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

29

53.    The Student began to act out by crying, screaming, hitting out and running away from school. On December 3, 1998, the Student's IEP was amended and his placement changed. The Student was returned to the developmental preschool class he attended the prior year with Anne Lundy, District special education teacher, at the District's Smith School. Exhibits P12-P13. The Smith School was located far enough from the Student's home that District staff believed he would be unable to runaway from school and return to his home. The Student received no basic education in the developmental preschool class. Exhibit P15, p. 1.

54.    A District reevaluation of the Student in February 1999 recommended the Student continue in his developmental preschool placement for the remainder of the school year, and then be placed into a first grade program with extensive special education support the next school year. Exhibit P15, p. 4. The option of providing only part-time special education the next school year was considered but rejected because the Student appeared to need extensive special instruction to catch up in language and academic skills. Exhibit P16, p. 1.

55.    The Student began first grade (1999-2000) in a self-contained special education classroom with Lois Smith, District special education teacher. The Student's IEP team met on October 29, 1999, to develop a new IEP. Exhibit P17. The IEP team determined the Student's placement would be a self-contained special education class with "pullout," because he needed special education but also needed to be with peers. Exhibit P17, p. 3. The Student's placement included being "mainstreamed" with general education students for library, physical education, music, recess, and lunch. All of the Student's academic instruction would take place in his self-contained special education classroom.

56.    The Student began second grade (2000-201) in a self-contained special education classroom with Ms, Smith. The Student's IEP team met on October 20, 2000, to develop a new IEP. Exhibit P18. The IEP team noted the Student was not regularly wearing his HAs. The IEP team determined the Student would spend 1095 minutes per week in the self-contained special education class, and would participate in "all Smith School activities" with general education students. Exhibit P18, p. 7. The only documentation of placement options considered for the Student was contained in a Prior Written Notice dated October 19, 2000, which informed the Parent a "regular classroom" was considered but rejected because the Student "needs one on one or small group," and was "hearing impaired." Exhibit P18, p. 12.

57.    The Student began third grade (2001-2002) in a self-contained special education classroom with Trudy Sylling, District special education teacher. The Student's IEP team met on October 19, 2001, to develop a new IEP. The IEP team noted the Student was in need of "one on one small group instruction." Exhibit P19, p. 4. The IEP determined the Student would spend 1655 minutes each week in his self-contained classroom for all his academic instruction, and spend 255 minutes each week participating in other school activities with general education students. Exhibit P19, p. 10. There is no documentation to find the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

58.    The Student began fourth grade (2002-2003) in a self-contained special education classroom with Ms. Sylling. The Student's IEP team met on October 18, 2002, to develop a new IEP. The IEP team noted the Student was in need of "one on one small group instruction." Exhibit P21, p. 1. The

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

IEP determined the Student would spend 1655 minutes each week in his self-contained classroom for all his academic instruction, and spend 255 minutes each week participating in other school activities with general education students. Exhibit P21, p. 6. There is no documentation to find the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

59.   The Student began fifth grade (2003-2004) in a self-contained special education classroom with Ms. Sylling. The Student's IEP team met on October 9, 2003, to develop a new IEP. The IEP team noted the Student was in need of "one on one small group instruction." Exhibit P24, p. 5.

60.   It cannot be determined from the face of the IEP document how much time the IEP team determined the Student would spend in his self-contained classroom and how much time he would spend with general education students. The IEP reflects the Student will spend either 1655 or 1450 minutes per week receiving all his academic instruction in his self-contained classroom. Exhibit P24, p. 11. There is no documentation to find that the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

61.   The Student began sixth grade (2004-2005) in a self-contained special education classroom with David Liddle, District special education teacher. The Student's IEP team met on October 7, 2004, to develop a new IEP. The IEP team noted the Student was in need of "one on one small group instruction." Exhibit P26, p. 4. The IEP determined the Student would spend 1680 minutes each week in his self-contained classroom for all his academic instruction, and spend 270 minutes each week participating in other school activities with general education students. Exhibit P26, p. 10. There is no documentation to find the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

62.   The Student began seventh grade (2005-2006) in a self-contained special education classroom with Jennifer Tucker, District special education teacher. Ms. Tucker was also the Student's IEP case manager. The Student's IEP team met on October 7, 2005, to develop a new IEP. The IEP team noted the Student "needs the support of one on one and small group instruction to meet his IEP objectives." Exhibit P32, p. 5. The IEP determined the Student would spend 1345 minutes each week in his self-contained classroom for all his academic instruction, and spend 535 minutes each week participating in other school activities with general education students. Exhibit P32, p. 11. There is no documentation to find the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

63.   The Student began eighth grade (2006-2007) in a self-contained special education classroom with Ms. Tucker. The Student's IEP team met on October 6, 2006, to develop a new IEP. The IEP team noted the Student "needs preferential seating, visual instructions in addition to oral instructions and instructions repeated. If is important for teachers to look at [the Student] when speaking as he reads lips." Exhibit P33, p. 7. The IEP determined the Student would spend 807 minutes each week in his self-contained classroom and spend 1073 minutes each week participating general education classes and other school activities with general education students. Exhibit P33, p. 13. There is no documentation or identification of any general education academic classes the Student would attend outside of his self-contained special education classroom. The IEP states the Student

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

"will receive instruction in the special education program for 807 minutes a week to address goals of his IEP." The 1073 minutes to be spent with general education students are identified as "classes, lunch, breaks, etc." Exhibit P33, p. 13. There is no documentation to find the IEP team considered any placement option other than a self-contained special education classroom for all of the Student's academic instruction.

64.    With the exception of the Prior Written Notice dated October 19, 2000, there is no documentation the Student's IEP teams ever discussed or considered any other placement for the Student from first grade (1999-200) through eighth grade (2006-2007).

65.    The other students in the Student's self-contained special education classroom varied year to year, and included students with a wide range of disabilities. Testimony of Thora Michels. Self-contained classrooms typically include autistic, multiply disabled, and "low-intelligence" students. Testimony of Diann Zavala. The Student's self-contained classrooms during seventh and/or eighth grade with Ms. Tucker included students receiving basic "life-skills" instruction, and other student's who were "verbal." There was one other DHH student in his self-contained classroom during either seventh or eighth grade, but that Student received her reading instruction in a resources room while the Student received his reading instruction in his self-contained classroom. In seventh grade most of the students in the Student's self-contained classroom had severe learning disabilities, including two students diagnosed with autism, one severely disabled student with a designated 1:1 aide and one student who was diagnosed with fetal alcohol syndrome. In eighth grade most of the other students were "high-functioning," capable of reading and writing sentences and socially involved with each other. Testimony of Jennifer Tucker.

66.    Ms. Tucker did not agree with the Student's placement in her self-contained special education classroom during seventh grade. Ms. Tucker believed the Student's cognitive abilities were in the normal range, and his academic skills were lower than she would have expected because he did not have sufficient hearing to access her curriculum. Ms. Tucker believed the Student had social skills typical of a middle school student. Ms. Tucker believed the Student would have been more appropriately placed in a resource room rather than a self-contained classroom. Testimony of Jennifer Tucker.

67.    Although the Student's eighth grade (2006-2007) IEP is not explicit, at some point the Student began to receive academic instruction outside of his self-contained special education classroom. This was apparently at the direction of Ms. Tucker. The Student received academic instruction in reading in a resource room taught by Sabrina Grant, and for at least some period of time received academic instruction in math in a class with both special and general education students. Testimony of Jennifer Tucker, Exhibit P45, pp. 12-16. Ms. Tucker apparently made these arrangements for academic instruction outside of the Student's self-contained classroom due to her disagreement with the Student's placement in seventh grade. Testimony of Jennifer Tucker.

68.    At some point during the Student's eighth grade year, Ms. Tucker was informed by Thora Michels that the self-contained classroom teacher at the District high school the Student would begin attending in ninth grade would be teaching only life-skills; the self-contained classroom at the high school would not be providing any academic instruction. Ms. Tucker was informed that if her middle school had any "high performing" students in special education classes, which included the

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

32

Student's self-contained special education classroom, those "high performing" students would be placed in a resource room beginning in ninth grade the following school year. Testimony of Jennifer Tucker, Exhibit D29, p. 1.

69.    The Student did not require any life-skills instruction, and Ms. Tucker realized he would have to be placed in a resource room when he moved to the high school to being ninth grade.

## Changes in Placement for the Student During Ninth Grade

70.    The Student began ninth grade (2007-2008) assigned to a resource room English class with Beth Ice, District high school resource room special education teacher, and a resource room math class with Sabrina Grant. Ms. Ice was also the Student's IEP case manager during ninth grade. The Student was assigned to general education classes for the remainder of the school day. Testimony of Beth Ice, Exhibit D29, p. 1.

71.    At the time he began ninth grade, the Student's current IEP (Exhibit P33, p. 7) had not been amended, nor had the District reevaluated the Student to determine whether a placement in a combination of resource room and general education classes was appropriate for the Student.

72.    Very shortly upon entering ninth grade, the Student began to experience difficulty with the academic work in his classes.

73.    The Student's IEP team met on October 5, 2007, to develop a new IEP. The Parent and the Student attended the IEP meeting. The Parent and the Student both told the IEP team that the Student was experiencing difficulty and frustration with his classes.

74.    There is conflicting evidence of record regarding the Parent's request at the IEP team meeting. Ms. Ice at first testified the Parent requested the Student be returned to a self-contained classroom, then later testified the Parent stated she wanted the Student to be placed in easier classes when he could receive more help. The IEP reflects a hand-written notation that the Parent and the Student requested the Student be placed in the self-contained classroom for reading, writing and science. Exhibit P39, p. 2. Given the level of the Parent's education and inability to speak English (it appears as though a family member or friend was acting as interpreter for the Parent, see, Exhibit 39, p. 15, signature of Vanessa S), it is found that the Parent likely was not requesting the Student be returned to a self-contained classroom, but rather was asking for additional help or assistance for the Student.

75.    The IEP team agreed to return the Student to a self-contained classroom effective October 8, 2007. The IEP included a notation that a "follow-up meeting may be call by his [the Student's] new special education teacher to make changes to reflect her classes. Exhibit P39, p. 2. The Student was reassigned to a self-contained classroom for English and science with Diana Dahlman, special education teacher. He remained in a resource room for math. Ms. Dahlman was designated the Student's IEP case manager.

76.    The District reevaluated the Student during January 2008. Exhibits P36-P37. During the course of this evaluation, the Parent reported to Joe West, District school psychologist, that the

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 18

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

33

Student did not want to go to school and was depressed, and she was concerned the Student was failing reading, writing and math. The Parent reported she had seen no improvement in the Student's speech or language during the past three years. Exhibit P36, p. 8. There is no indication the reevaluation included any information from the Diana Dahlman.

77.   On February 27, 2008, the Student's October 5, 2007, IEP was amended. The Documentation of IEP Revision/Amendment stated;

> Reason for the amendment:
> Student is currently receiving reading and writing instruction in a self-contained classroom. IEP team at evaluation did not perceive this to be an appropriate placement for this student's ability and needs. A more LRE is available. IEP case manager will also need to be changed due to new placement of student.
>
> Amendment:
> Specially designed instruction in reading and writing will be designed, evaluated and revised by the special education teacher and delivered in the general education classroom.
>
> Mrs. Dahlman is the current case manager and this will be changed to Mrs. Grant.

Exhibit P39, p. 1.

78.   On February 28, 2008, Joe West sent an email to multiple individuals including Irma Gonzalez-Ramos, the Student's assigned high school counselor, Ms. Jensen and Ms. Grant, summarizing the outcome of the IEP meeting the day before. Exhibit P51, p. 10. Ms. Gonzalez-Ramos had not been invited to the IEP meeting. Ms. Gonzalez-Ramos forwarded the email to Beth Ice. After Ms. Ice also expressed her interest in how the IEP team decided to return the Student to a general education English class, Ms. Gonzalez-Ramos forwarded Mr. West's email to Mike Closner, the high school principal, expressing both her and Ms. Ice's reservations. Exhibit P51, p. 9. Ms. Gonzalez-Ramos also told Mr. West she disagreed with the IEP team's decision to place the Student in a general education English class. As the Student's high school counselor, Ms. Gonzalez-Ramos believed she should have been invited to the IEP team meeting.

79.   Elizabeth Jensen testified the Student began attending her general education English class likely weeks before she attended an IEP meeting on March 6, 2008. There is conflicting evidence of record regarding when the Student began attending Ms. Jensen's class. See, e.g. Exhibits P48, p. 29 and P40 pp. 1-10. After consideration of all the evidence, it is found that the Student began attending Ms. Jensen's general education English classes at least a period of weeks prior to the March 6, 2008, IEP meeting.

80.   On March 6, 2008, an IEP form was filled out and signed by District staff members and the Parent. Exhibit P40. Under the Statement of Present Levels of Performance, the form stated in part that the Student;

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

34

[W]as previously served in reading and writing in Mrs. Dahlman's room. The IEP team HAs come to a decision that this is not his least restrictive environment and will therefore be served in Mrs. Jensen's room under the supervision of Sabrina Grant.

Exhibit P40, p. 2.

## Parent's Participation in the Student's Education

81.   Over the course of the Student's education within the District, the Parent and District staff met for parent-teacher conferences, evaluation meetings and Individualized Education Program (IEP) meetings on multiple occasions.

82.   From the Student's first IEP meeting in November 1998 through his last IEP meeting in October 2009, only the following partial or complete documents in the Student's educational records are printed in Spanish:

| Document | Date | Exhibit # |
|---|---|---|
| Notice of Action | 1/4/99 | P14 p. 1 |
| Consent for Revaluation | 1/20/99 | P14 p. 4 |
| IEP (1- page only) | 01/02 SY | P19 p. 7 |
| Notice of Action | 1/25/02 | P22 p. 8 |
| IEP | 10/7/04 | P26 p. 12 |
| Medicaid Elig Verification (1-page only) | 11/16/04 | P27, p 6 |
| Invitation to Attend Meeting | 1/12/05 | P29 p. 1 |
| Prior Written Notice | 1/12/05 | P29, p. 3 |
| Invitation to Attend Meeting | 9/21/05 | P32 p. 4 |
| IEP | 10/7/05 | P32 p. 13 |
| Prior Written Notice | 9/22/06 | P33 p. 3 |
| Invitation to Attend Meeting | 9/22/06 | P33 p. 5 |
| IEP | 10/6/06 | P33 p. 16 |
| Prior Written Notice | 11/21/07 | P34 p. 1 |
| Parent Consent | 11/21/07 | P34 p. 5 |
| Medicaid Elig Verification (1-page only) | Undated | P34 p. 6 |
| Notice of Action and Eval Results | 1/29/08 | P37 p. 5 |
| IEP (1- page only) | 07-08 SY | P39 p. 7 |
| Progress Reports (English/Spanish) | Gr.s 6-9 | P44, p.1 |
| Attendance Report (English/Spanish) | 2001-2004 | P45, pp.1-3 |

83.   Other than the partial or complete documents identified above, all documentation in the Student's educational records from November 1998 through October 2009 is printed in English.

84.   Prior Written Notice and Invitation to Attend a Meeting forms printed in English were filled out by the District and dated January 22, 2002, but neither of the documents identifies the date nor time for any meeting.  Exhibit P22, pp. 2-4.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

35

85.    The Parent attended an IEP meeting at the District on November 18, 2002.  The Student's Sister attended the meeting with the Parent.  The Student's Sister served as the Parent's interpreter for the IEP meeting.  The only participants at the IEP meeting were the Parent, the Sister and the Student's forth grade special education teacher, Trudy Sylling.  Ms. Sylling does not speak Spanish.  All three participants signed the IEP form during the meeting.  Exhibit P23, p. 10

86.    The IEP form HAs three signatures in addition to the Parent's, Sister's and Ms. Sylling's signatures.  Exhibit P23, p. 10.  None of these individuals whose signature appear on the IEP form attended the IEP meeting.  One of the signatures is Thora Michels' signature.  At that time, Ms. Michels was special programs director for the District.

87.    The District prepared IEP forms in both English and Spanish for the 2004-2005 school year.  However, the IEPs do not reflect the same information.  Compare, Exhibit P26, p. 4 with Exhibit P26, p. 12.  IEP forms prepared in Spanish by the District are incomplete when compared to their English counterpart.  See, Exhibit P32 - Spanish IEP does not include Summary of Services Matrix page.

88.    The District held a reevaluation meeting regarding the Student on January 25, 2005.  The Parent was not contacted to provide any information for the reevaluation.  The Confidential Reevaluation Report does not reflect any information was obtained from the Parent for consideration.  Exhibit P30, p. 2.  The Report was not signed by the Parent.  The Parent was not invited to the reevaluation meeting and did not attend the meeting.

89.    The record does not reflect documentation of any invitation in English or Spanish to the Parent to attend an IEP meeting for the Student for the 2007-2008 school year, or for amendments or revisions to the Student's IEP during February or March 2008.

90.    The record does not reflect documentation of any prior written notice provided to the Parent in English or Spanish regarding review, modification or amendment to the Student's IEP for the 2007-2008 school year.

91.    The District held a meeting on February 27, 2008, to revise or amend the Student's IEP.  There is no evidence of record the Parent was invited to attend the meeting.  Subsequent to the meeting, school district staff visited the Parent at her home, where she signed the IEP Revision/Amendment form.  Exhibit P39, p. 1.

92.    The Parent and the Student attended an IEP meeting during October 2008.  They were accompanied by the same Sister who acted as interpreter for the Parent during the November 18, 2002, IEP meeting.  The only other participant present for the IEP meeting was Rick Ramos.  The Sister accompanied the Parent at the Parent's request to help her communicate.  Mr. Ramos speaks Spanish, but had difficulty translating the IEP, which was printed in English, into Spanish.  The Sister had difficulty understanding what Mr. Ramos was trying to say in Spanish.  The Sister had to interpret the majority of what Mr. Ramos was saying in English into Spanish for the Parent as best the Sister was able.  Exhibit P41, pp. 4-13.  Mr. Ramos prepared an IEP already written for the Parent to sign.  The IEP was printed in English, except for one page in Spanish.

93.    Mr. Ramos characterized his own command of spoken Spanish as "kind of bad".

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  21

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

94.    Unable to read or write either Spanish or English, and knowing the District was aware of this, the Parent would routinely sign whatever documents the District requested she sign.

95.    The record does not contain any documentation verifying the Parent was provided with a copy of any procedural safeguards notice in English or Spanish.

96.    Jennifer Tucker, Elizabeth Ice and Maria Fisher, District assistant secretary for student assessment, all provided testimony regarding their standard practices with respect to providing parents with procedural safeguards notices, reevaluation notices, prior written notices and/or parent consent forms. While these district staff were able to provide testimony generally regarding their standard practices, they had no specific recollection and offered no testimony or evidence to establish they provided any of the above identified documentation to the Parent. The only exception to this was Ms. Fisher, who confirmed she provided the Parent with a copy of a prior written notice and an invitation to attend a meeting when she visited the Parent at her home with Mr. West.

97.    The Parent attended an IEP team meeting on December 14, 2009. Dr. Julia Coe also attended the meeting. The District did not provide a Spanish interpreter for the Parent. A family friend sat beside the Parent and occasionally whispered to her. The Parent was effectively unable to communicate with the English-speaking participants. Declaration of Julia Coe, Exhibit P56, p. 7, Testimony of Girlfriend of Student's Brother. Sherry Mashburn, PAVE parent advocate, also attended with meeting with the Parent. During the course of the meeting, Ms. Mashburn stated that the Student's family wanted the District to pay for an evaluation of the Student by an outside expert experienced in assessing hearing-impaired students. Patrick Walsh, District school psychologist, said an independent educational evaluation was not necessary.

98.    The District did not pay for an IEE nor request a due process hearing to defend its evaluation of the Student.

99.    On at least three occasions Maria Fisher accompanied Joe West to the Parent's home to act as Spanish Interpreter. Ms. Fisher did not provide a word-for-word interpretation of Mr. West's statements to the Parent. Ms. Fisher "summarized" what Mr. West said to the Parent, and attempted to communicate the "main points" to the Parent. Testimony of Maria Fisher.

**Transition Planning for the Student**

100. The Student turned 16 years old during the period of time his October 5, 2008, IEP was in effect. The Student's October 5, 2008, and October 5, 2009, IEPs are devoid of any transition planning for the Student. There is no information regarding appropriate measurable postsecondary goals. There is no information regarding any transition assessments. There is no information regarding any transition services. Exhibits P41, p. 10, P42, p. 9.

101. Rick Ramos is the District staff person responsible for development of these two IEPs for the Student, including development of transition planning. Mr. Ramos testified there is no information regarding transition planning, assessment or services on the Student's IEPs because he did not attach the transition plan to the IEPs. Mr. Ramos testified he keeps everything on his computer's

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

37

hard drive at the District. Mr. Ramos' testimony is clearly self-serving and is found not credible. It is found the District has not to date engaged in any transition planning for the Student.

### Extended School Year Services

102. In the District's reevaluation of the Student during 1999, the Patrick Walsh, District school psychologist, stated that at the time of the evaluation, "there was not adequate information to determine the need for an extended school year. That determination should be made after more is known about [the Student's] achievement rate." Exhibit P15, p. 4.

103. The Student's October 29, 1999, IEP under the section "NEED FOR EXTENDED SCHOOL YEAR," states, "learning problems are not result of a lack of school opportunity." Exhibit 17, p. 2.

104. Ms. Merz assessed the Student's language skills on October 2, 2007, using the Woodcock-Munoz Language Survey-Revised test. Exhibit P35. Although the Student was incorrectly "normed" for the wrong age, Ms. Merz opined the test results were artificially low because of the recent summer break from school. Ms. Merz opined her assessment results indicate the Student was possibly eligible to receive extended school year (ESY) services. Testimony of Barbara Merz.

105. The IEP forms typically used by the District have a section designated for consideration of an extended school year;

### EXTENDED SCHOOL YEAR

> Is this student in need of an extended school year? no ☐ yes ☐ If yes, See the Summary of Services Matrix. If no, the decision was made because the IEP team determined that this student did not need extended school year services. The decision was not based upon the disabling condition, or a unilateral limit upon the type, amount, or duration of services.

See, e.g. Exhibit P24, p. 10.

106. The Student's IEPs were routinely checked "no" for need for an extended school year.

### Change in Student's Eligibility Category

107. The Student's October 5, 2007, IEP identified the Student's disability category as SLD. Exhibit 39, p. 2. SLD is commonly understood by District staff to be the abbreviation for specific learning disability. Prior IEPs for the Student had identified his disability category as hearing impaired. See e.g. Exhibits P26, P32, P33.

108. The identification of the Student's disability category as SLD continued on his IEP in March 2008. Exhibit P40. In October 8, 2008, IEP for the Student, his disability category is identified as "HH," which is commonly understood to mean hard of hearing. However, in the Present Levels of Performance section, the IEP states the Student "still qualifies for the services under the category of hearing impaired and SLD." Exhibit P41, p. 4.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX (206) 587-5135

38

109. In October 5, 2009, IEP for the Student, his disability category is identified as "HH". However, in the Present Levels of Performance section, the IEP states the Student "still qualifies for the services under the category of hearing impaired and SLD."  Exhibit P42, p. 4.

110. While the Student's IEPs begin in 2007 to identify or reference an SLD, there are no discernable substantive differences in the Student's IEPs pre- and post-2007 in terms of the goals and objectives or services proposed that indicate the District is recognizing or attempting to provide services to address any type of specific learning disorder for the Student. It is found as fact that the presence of language identifying or relating to a specific learning disorder in the Student's IEPs is more likely than not a clerical error, and it not any substantive change in the Student's disability category.

## The Student's Educational Progress

111. The Student's progress in academic, speech and language and other areas was assessed by the District using a variety of standardized tools, observations and classroom performance over the course of his attendance in the District.  The District's own assessments of the Student's academic and speech and language abilities consistently showed his abilities significantly lagged behind his chronological age and grade.  The Student is presently attending his senior year of high school.  By the District's own admission, the Student reads at approximately a second grade level. Testimony of Diann Zavala.   As of October 2009, the Student's IEP reflects his reading comprehension and recognition at the second grade level, and his math skills at a third grade level. This is consistent with assessment from non-District professionals.  Exhibit P70, p. 20.

112. The Student earned grades, and those grades were documented and reported by the District to the Parent over the course of the Student's education in the District.  Until the Student entered high school and was enrolled in general education classes for academic subjects, the Student had received all his academic instruction in a self-contained special education class, with the limited exception of one or two resource room classes in eighth grade.  The grades reported for the Student over the years leading up to high school reflect apparent high achievement.  The Student was reported to be demonstrating extra to superior efforts in elementary school.  Exhibit P45, pp. 1-3. In middle school, the Student was reported earning primarily "A" and "B" grades.  Exhibit P45, pp. 4-16.

113. District witnesses testified, and it is found as fact, that the Student's reported grades were accurate representations of the success he achieved on the school work he was assigned. However, the Student was not assigned school work equivalent to his chronological grade level. The Student was in a self-contained special education classroom being assigned and working on modified curriculum which was substantially below his chronological grade.

## Dr. Wendy Marlowe's Neuropsychological Evaluation of the Student

114. Dr. Wendy Marlowe is a clinical neuropsychologist and language pathologist.  Her curriculum vitae is Exhibit P64, pp. 5-20.  Dr. Marlowe conducted a neuropsychological evaluation of the Student over a period of three days in February 2010.  Dr. Marlowe's neuropsychological evaluation of the Student is Exhibit P70.  Dr. Marlowe's declaration and supplemental declaration are Exhibits

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page 24

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

P64 and P69. Based upon her education, training and experience, it is found that Dr. Marlowe is qualified to perform the Student's evaluation and offer the expert opinions and recommendations expressed in her neuropsychological evaluation of the Student, declaration and supplemental declaration. It is found that Dr. Marlowe's neuropsychological assessment of the Student is valid and reliable.

115.   The Student's cognitive abilities are well within the average range. He has the ability to learn easily, benefit from practice, consolidate information and retain it over time. The Student's executive functions and memory are unimpaired. The Student reading and math skills range from the second to mid-fourth grade range, with most of those skill areas falling in the mid-second to third grade level. The Student language skills are severely impaired. The Student does not have a viable communication system. Exhibit P69, p. 37. Even with amplification, it is impossible for him to hear mid and high frequencies. The Student's ability to speech or "lip" read are limited in both Spanish and English. The extent of his language limitations renders him unable to benefit from verbal classroom instruction. The Student uses a wide range of visual cues to attempt to understand verbalizations he cannot hear. The Student's limited ability to use expressive language was comparable in Spanish and English. The Student is unable to recognize most single words at or above a third grade level, which results in the Student being unable to use reading as a vehicle for learning. Exhibit P69, p. 40. The Student's written language skills are too limited to permit him to engage in effective communication of his thoughts, experiences or ideas. Exhibit P69, p. 40.

116.   Adaptive behavior refers to an individual's typical performance of day-to-day activities required for personal and social sufficiency. Individuals with specific handicapping conditions, including deafness, may demonstrate specific areas of dysfunction in daily life activities in the absence of appropriate compensation such as an alternative communication system. The Student's absence of a viable communication system would preclude him from seeking help in a medical emergency, follow directions for healthcare procedures, re-order medications or make appointments due to his limited communication skills in oral language and reading. Exhibit P69, p. 43. The Student is socially competent in areas that do not require a communication system.

117.   The Student demonstrates the signs and symptoms that characterize a major depressive episode. Although he meets the diagnostic criteria for major depressive disorder, because his depression is specifically in response to his school placement and treatment in the District, the most appropriate diagnosis is adjustment disorder with mixed anxiety and depression. The Student's adjustment disorder developed specifically in reaction to his school placement and treatment in the District as he became increasingly aware of the discrepancy between his skills and the requisite skills for success in the world following high school. Exhibit P69, p. 42.

118.   Dr. Marlowe's neuropsychological evaluation is not the first evidence of the Student's identified depression or adjustment disorder. Dr. Carl Fields is the Student's long-time family physician. Dr. Fields saw the Student in November 2009 and administered a depression screening which showed the Student was depressed. Dr. Fields attributed the Student' depression to his difficulties with school. Dr. Fields prescribed 10 mg of fluoxetine to treat the Student's depression. In December 2009, Dr. Fields increased this to 20 mg of fluoxetine. Dr. Fields saw the Student for a follow up in April 2010, and he showed little improvement. In June 2010, Dr. Fields changed the Student's depression medication to Celexa. Testimony of Dr. Fields, Exhibits P2, P68.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

40

119.  Based upon her expertise as a clinical neuropsychologist and language pathologist and her neuropsychological evaluation of the Student, Dr. Marlowe made recommendations for services and training the Student will require to provide him with the skills, knowledge and abilities he would likely have obtained had he been provided an appropriate educational program beginning in kindergarten. These recommendations included the following: The Student should continue to receive special education services until the age of 21, with the focus of his special education services being transition services in the areas of English acquisition/reading, sign language training, computers and job training.  The Student's special education and transition services should not be provided by the District, as this would likely exacerbate the Student's current adjustment disorder.  The Student's transition program should include individualized and one-on-one tutoring with an individual who has expertise working with DHH students on vocabulary development, reading, mathematics and computer training to increase his skills to fifth or sixth grade level.  The Student should be provided the opportunity to learn American Sign Language (ASL).  Exhibit P69, paragraphs 140 through 153. The recommendations at paragraphs 140 through 153 are adopted as findings of fact herein.

120.  It is Dr. Marlowe's opinion that the Student will require 12 years to complete a program based upon her recommendations, such that at the end of the program the Student will have the skills, knowledge and abilities he would have had if the District had provided him with an appropriate educational program over the past 12 years.

121.  Dr. Virginia Francis is employed by the District as a school psychologist.  Dr. Francis holds a Ph.D. in Education, and a Masters Degree in Special Education with major in School Psychology. Dr. Francis' curriculum vitae is Exhibit D37.  Dr. Francis reviewed Dr. Marlowe's neuropsychological evaluation of the Student and the Student's District educational records, including Mr. Walsh's and Mr. West's psychological evaluations of the Student.  However, Dr. Francis did not review the Student's IEPs.  Dr. Francis has had no direct contact with the Student.  Dr. Francis has never personally assessed or evaluated the Student.  Dr. Francis provided testimony regarding her assessment and interpretation of Dr. Marlowe's neuropsychological evaluation of the Student, and her opinions regarding Dr. Marlowe's conclusions and recommendations for the Student.

122.  It is clear that Drs. Marlowe and Francis are highly educated and experienced professionals. It is equally clear that the opinions of Drs. Marlow and Francis regarding the Student are the result of careful thought and analysis.  However, after careful review of the record, it is found that Dr. Marlowe' opinions and recommendations warrant greater weight than those of Dr. Francis.  Dr. Marlowe's qualifications and experience as a clinical neuropsychologist and language pathologist are likely more applicable to a comprehensive evaluation of the Student than Dr. Francis' qualifications.  This was apparent when Dr. Francis was unable to fully explain or interpret all of Dr. Marlowe's diagnosis on Axis I, III, IV and V of the Diagnostic and Statistical Manual (DSM).  Dr. Marlowe also had the benefit of a more thorough review of the Student's educational records, including his IEPs.  Most critically, Dr. Marlowe had the opportunity and advantage of meeting the Student in person and conducting an evaluation of the Student over three days in February 2010. Dr. Francis has never met the Student.  Accordingly, these Findings of Fact reflect the assessment and opinions of Dr. Marlowe rather than Dr. Francis.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

41

## Jennifer White's Evaluation of the Student

123.   Jennifer White is an educational and vocational consultant, specializing in working with deaf, hard of hearing and deaf/blind individuals. Ms. White's curriculum vitae is Exhibit P72, Attachment 1. Ms. White's declaration is contained in Exhibit P72. Ms. White's consultation services report is Exhibit P72, Attachment 2. Based upon her education, training and experience, it is found that Ms. White is qualified to perform the evaluation and offer the expert opinions and recommendations expressed in her declaration and consultation services report. It is found that Ms. White's evaluation and recommendations for the Student are valid and reliable.

124.   Ms. White reviewed all of the Student's IEPs and related documents, contacted Sherry Mashburn, Dr. Julia Coe, Dr. Wendy Marlowe, met with the Student and his family at their home, and accompanied the Student and the Parent to a parent-teacher conference at the Student's high school to gather information for her evaluation. When she met with the Student in his home, Ms. White assessed the Student's ability to speech or "lip" read using the Utley Speech-Reading Test. The Student demonstrated a poor ability to speech read. P72, p. 18.

125.   Based upon her education, training and experience and her evaluation of the Student, Ms. White made recommendations for services the Student requires to provide him with the skills which he was unable to develop due to a lack of accommodation over the course of this enrollment in the District. P72, pp. 21-23. Ms. White's recommendations are adopted as findings of fact herein.

126.   It is Ms. White's opinion that the Student will likely never catch up linguistically or academically. It is Ms. White's opinion that the Student will require 10 years of concentrated tutoring with a teacher of the DHH for the Student to achieve a functional set of skills for independent living. Testimony of Jennifer White.

## Dr. Barbara Luetke's Record Review and Interview with the Student

127.   Dr. Barbara Luetke holds a Ph.D. in Deaf Education/Bilingual Education, and is presently employed as an administrator for the Northwest School for Hearing Impaired Children (NWSFHIC). Dr. Luetke's curriculum vitae is Exhibit P73, Attachment 1. Dr. Luetke's declaration is contained in Exhibit P72. Based upon her education, training and experience, it is found that Dr. Luetke is qualified to offer the expert opinions and recommendations expressed in her declaration.

128.   Dr. Luetke reviewed each of the Student's IEPs from preschool through the 2009-2010 school year, and all of Parent's proposed Exhibits P1 -P64. Dr. Luetke met with the Student at his home on June 20,2010, for approximately 45 to 50 minutes.

129.   It is Dr. Luetke's opinion, and it is found as fact, that based upon the information about the Student and his hearing impairment known to the District at the time, the District should have implemented a program of either Signing Exact English (SEE) or American Sign Language (ASL) starting in kindergarten to allow the Student to access instruction and socialization. Exhibit P73, p. 5.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

130.  It is Dr. Luetke's opinion, and it is found as fact, that based upon the information about the Student and his hearing impairment known to the District at the time, the District should have implemented a program which included provision of SLP services 3-5 times per week for 30 minutes per day starting in kindergarten.  Exhibit P73, p. 5.

131.  It is Dr. Luetke's opinion, and it is found as fact, that based upon the information about the Student and his hearing impairment known to the District at the time, the District should have provided the Student with an FM amplification system starting in kindergarten.  Exhibit P73, p. 5.

## CONCLUSIONS OF LAW

### Jurisdiction and Burden of Proof

1.  OAH has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 U.S.C. §1401 et.seq.  (Individuals with Disabilities Education Improvement Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated thereunder, including 34 Code of Federal Regulations (CFR) §300 et.seq., and Chapter 392-172A Washington Administrative Code (WAC).

2.  The burden of proof in an administrative hearing under the IDEA is on the party seeking relief. See Schaffer v. Weast, 546 US 49 (2005).  The party seeking relief in this case is the Parents.  The Parents therefore have the burden of proof.

### Free Appropriate Public Education and Educational Benefit

3.  A student determined eligible to receive special education and related services is entitled to a free appropriate public education (FAPE).  FAPE means special education and related services that have been provided to the student at public expense and without charge, that meet State educational standards, and that are provided in conformity with the student's individualized education program (IEP).  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; WAC 392-172A-01080. "Special education" means specially designed instruction, at no cost to parents, to meet the unique needs of the student.  20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; WAC 392-172A-01175.  The Student was determined eligible to receive special education and related services prior to the commencement of the period at issue; the 1998-1999 kindergarten year.  The Student remained eligible for special education through the filing of the Complaint; January 15, 2010.  Therefore the District is obligated to provide the Student with FAPE during the entire period at issue.

4.  There is both a procedural and a substantive test to determine if a school district has complied with the IDEA and provided a student FAPE.  Reviewing courts must inquire;

> First, has the State complied with the procedures set forth in the Act?  And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page 28

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

43

*Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176 (1982). "If a violation of the IDEA is found in either regard, the court shall 'grant such relief as [it] deems appropriate.'" *Hacienda La Puente Sch. Dist. of L.A. v. Honig,* 976 F.2d 487, 492 (9th Cir. 1992). In this case, the Parent has alleged both procedural and substantive violations of the IDEA.

An inquiry must be made into whether a school district has met the "rigorous procedural requirements of the IDEA" and any "State standards that impose a greater duty." *Union School Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir. 1994). If a school district cannot demonstrate that it has complied with the procedures in the IDEA and state education laws, the question of whether its proposed program meets the substantive benefit test need not be addressed. *W.G. v. Target Range Sch. Dist. No. 23, Bd. of Trustees,* 960 F.2d 1479, 1485 (9th Cir. 1992).

5.      Procedural violations do not automatically require a finding of a denial of FAPE. However, procedural violations that impede the student's right to FAPE, significantly impede the parent's opportunity to participate in the decision-making process regarding the provision of FAPE, or caused a deprivation of educational benefit clearly result in the denial of FAPE. 34 C.F.R. § 300.513(a)(2); WAC 392-172A-05105(2).

6.      The second prong of the *Rowley* test to determine whether a district has substantively complied with the IDEA and provided FAPE is whether the IEP was reasonably calculated to enable a student to receive educational benefit. *Rowley,* at 207. The standard is met if a district provides personalized instruction with sufficient supportive services to permit a student to benefit from the instruction. *Id.* at 189. Whether an IEP was reasonably calculated to provide educational benefit is measured at the time the IEP was developed. *Adams v. State of Oregon,* 195 F.3d 1141, 1149 (1999, 9th Cir.). The pertinent question is whether the IEP was "appropriately designed and implemented so as to convey [a student] with meaningful benefit." *Id.*

7.      A district is not obligated to provide the best instruction. FAPE does not mean the absolutely best or potential-maximizing education for the individual child. Districts must provide "'a basic floor of opportunity' through a program 'individually designed to provide educational benefit to the handicapped child.'" *Gregory K. v. Longview School Dist.,* 811 F.2d 1307, 1314 (9th Cir. 1987), citing *Rowley,* 458 U.S. at 201. FAPE is provided if the student derives more than minimal or trivial progress in a placement, considering the student's unique characteristics. *Florence County Sch. Dist. Four v. Carter,* 950 F.2d 156, 160 (4th Cir. 1991), affd. 510 U.S. 7 (1993).

8.      In the Ninth Circuit, educational progress is not only measured by a student demonstrating competence in the academic setting, but also by the progress a student makes on the central goals of the IEP. *County of San Diego v. Calif. Special Education Hearing Office,* 93 F.3d 1458, 1467 (1996, 9th Cir.). Educational needs are to be construed to include not only a student's ability to score well on a test, but also "the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs." *Seattle Sch. Dist. No. 1 v. B.S.,* 82 F.3d 1493, 1500 (1996, 9th Cir.).

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

**Failure to Implement IEPs**

9.      Material failures to implement an IEP violate the IDEA. On the other hand, minor discrepancies between the services a school provides and the services required by the IEP do not violate the IDEA. See *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811 (9th Cir. 2007).

>     "[S]pecial education and related services" need only be provided "*in conformity with*" the IEP. [20 USC §1401(9)] There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education.
>
>     . . .
>     We hold that a *material* failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP.

*Van Duyn, supra,* 502 F.3d at 821 and 822 (italics in original).

**Least Restrictive Environment**

10.     The IDEA requires a school district to implement an eligible student's IEP in the student's least restrictive environment (LRE). Inclusion in the general education classroom is presumed to be a student's LRE.

11.     WAC 392-172A-02050 provides that a school district shall ensure that the provision of services to each student eligible for special education shall be provided;

>     [T]o the maximum extent appropriate in the general education environment with students who are nondisabled...and [s]pecial classes, separate schooling or other removal of students eligible for special education from the general educational environment occurs only if the nature or severity of the disability is such that education in general education classes with the use of supplementary aids and services cannot be achieved satisfactorily.

In *Sacramento Unified Sch. Dist. v. Rachel H.,* 14 F. 3d 1398 (9th Cir.), *cert denied,* 114 S. Ct. 2679 (1994), the court applied a four-part test to determine the student's LRE;

>     (1) the educational benefits available to the student in a regular classroom, supplemented with appropriate aids and services, as compared with the educational benefits of a special education classroom;
>
>     (2) the non-academic benefits of interaction with children who were not disabled;
>
>     (3) the effect of the student's presence on the teacher and other children in the classroom; and,
>
>     (4) the cost of mainstreaming the student in a regular classroom.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

*HS*

At the time of the court's decision, the student was 11 years old, moderately mentally retarded, with an I.Q. of 44. The student was motivated to learn, learned by imitation, and was not disruptive. The court rejected the district's proposal for a special education classroom for academic subjects and regular class for non-academic subjects such as art, music, lunch and recess (which would have required six classroom changes each day). The court found that the LRE for the student was full-time placement in her regular education classroom with support services, including the assistance of a consultant and part-time aide.

Later the same year, in *Clyde K. ex rel. Ryan K. v. Puyallup School District*, 35 F.3d 1396 (9th Cir. 1994), the court applied the same four-part test and found that the least restrictive environment for the student was a self-contained special education classroom. Unlike the student in *Holland*, the student was diagnosed with Tourette Syndrome and Attention Deficit Hyperactivity Disorder (ADHD), was frequently disruptive to the class, engaged in name-calling, sexually explicit profanity, as well as kicking and hitting classroom furniture. At the time of the hearing he had been involved in two violent confrontations and removed from the regular education classroom.

The court noted that the student's behavior largely prevented him from learning, and that an aide would not have made a meaningful difference. In addition, the student did not model his behavior on that of his non-disabled peers, he was socially isolated and suffered a great deal of stress from teasing by the other students. The student's presence in the regular education classroom had an overwhelmingly negative effect on teachers and other students, interfering with their ability to learn. The court further states "Disruptive behavior that significantly impairs the education of other students strongly suggests a mainstream placement is no longer appropriate. See. 34 CFR § 300.552, Comment."

12.    A student's right to placement in his/her LRE is both a procedural and substantive right. Substantively, it is independent of the obligation to provide FAPE and is not amenable to the FAPE analysis put forth in *Rowley, id,* and its progeny such as *Target Range, id.* See *Greer by Greer v. Rome City Sch. Dist.* 967 F.2d 470 (11th Cir. 1992). School district failures to provide a student FAPE in the least restrictive environment have routinely resulted in determinations that a placement was not appropriate. See *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994).

### Failure to Provide SLP Services to the Student

13.    The Parent argued the District failed to provide the SLP instruction the Student required in order to develop effective communication skills. During the entire period at issue, the Student's IEPs required the District to provide him with 40 minutes of SLP services per week. The District did not present sufficient evidence to find it provided SLP services to the Student in conformity with his IEPs. The SLP service logs are not credible or reliable. It is first concluded the District materially failed to implement the Student's IEPs when it failed to provide 40 minutes of SLP services in conformity with his IEPs. This is a substantive denial of FAPE.

14.    Given the information known to the District at the time his IEPs were developed, it is concluded the District denied the Student FAPE by failing to provide more than 40 minutes of SLP services per week. This is a substantive denial of FAPE. It is concluded that the District's failure

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 31

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

46

materially contributed to the Student having no viable communication system. The Student's severe hearing impairment and speech and language delays were clearly known to the District when the Student entered Kindergarten. Expert testimony establishes the District should have known 40 minutes of SLP services per week was insufficient to provide a meaningful educational benefit to the Student to address the effects of his severe hearing impairment on his speech and language. Furthermore, it is manifestly clear that over the course of 12 years the District never considered adding additional SLPs services despite the Student continuing to struggling with the academic requirements of school as he grew older. The Student is not cognitively impaired. The Student is now a senior in high school but does not possess a viable communication system. It is concluded the Student did not derive more than a minimal or trivial benefit from the SLPs services in his IEPs.

## Failure of the District to Provide an FM System to the Student

15.     The Parent argued the District failed to provide the Student with an FM system until the Student was in eleventh grade. The District argued it had provided the Student with an FM system prior to eleventh grade, and in fact the District had made a Comtek FM system available to the Student at least intermittently during middle school. However, it is also a matter of fact that the Comtek system was not selected or calibrated by a licensed clinical audiologist to be used with the Student's HAs. Without the involvement of a such an audiologist, there is no way to determine if the Student received any educational benefit from the Comtek system. And the District SLP admitted it would be no more than a guess whether the Student would have received any benefit from use of the Comtek system without his HAs. The true issue is whether the District should have known the Student required an FM system to obtain an educational benefit, and if so whether the District provided an FM system that was appropriate for the Student and provided any educational benefit.

16.     It is clear from the record the District knew the Student required an FM system to obtain an educational benefit. The District's SLPs knew as early as 1999 that he could not hear many of the basic vowel and consonant sounds, that ambient noise would severely effect his ability to distinguish auditory input and that this would have a negative educational impact. References to use of an amplification and/or an FM system appear intermittently throughout the Student's IEPs. Despite this, the District never took the steps it needed to provide the Student with an FM system selected and calibrated for his HAs until after he was in eleventh grade. It is concluded this failure materially contributed to the Student's failure to develop a viable communication system, constitutes a substantive failure to implement the Student's IEPs and denied the Student FAPE.

## Failure to Allow the Parent Meaningful Participation in the Educational Process

17.     The record is clear the District failed on multiple occasions to provide the Parent with written materials in her native language. It is equally clear the District was aware for many years the Parent was illiterate in both English and Spanish. While there is no legal requirement a district provide *certified* interpreters for meetings with parents who do not speak English, at the very least Districts must provide interpreters who are sufficiently fluent to ensure a non-English speaking parent is provided a meaningful opportunity to participate in the meeting. Any individual selected by a district should be able to accurately interpret the contents of an IEP in more than summary fashion. IEPs are complex documents, and a clear understanding of the details of the contents is critical to a parent making informed decisions for their children's education. If a school district is aware a parent

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

47

does not speak English, the burden is on the district to provide a suitably fluent interpreter.  In the Parent's case, the District relied upon individuals including Mr. Ramos, who characterized his own command of Spanish as "kind of bad." At other times, it is clear the District relied upon the Parent providing her own interpreter.  It is concluded that the District significantly impeded the Parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the Student, and that by causing such impediment likely caused the Student to be deprived of educational benefit.

18.     The District failed to conduct IEP meetings in accordance with the IDEA when Mr. Ramos met with one or two IEP teams members, completed the IEPs, then went to the Parent's home to get her signature, and then finally went to other required IEP team members to summarize what was discussed at the meeting and get their signatures on the IEP. WAC 392-172A-03095, -03100. What is especially disturbing in this conduct is that the IEP forms in no way reflect what occurred. The integrity of the IEP is vital to the education of a student.  Parents, students and school districts must be able to rely upon the IEP as the embodiment of the student's educational program. Given the manner in which Mr. Ramos presented the IEPs in question to the Parent and Mr. Ramos' limited ability to explain the IEPs to the Parent in Spanish, it is concluded the District effectively predetermined the Student's two IEPs, and more likely than not did not consider any input from the Parent. It is left to the imagination how a non-English speaking parent could provide any informed input under these circumstances.  It is concluded the these procedural violations significantly impeded the Parent's opportunity to participate in the decision-making process, and caused a denial of FAPE for the Student.  It is also concluded the District did not include the Parent as a part of the IEP team in the manner contemplated in the IDEA, and thereby denied the Student FAPE.

19.     It is concluded the District did not misrepresent the Student's progress to the Parent. There was an understandable but not intentional misunderstanding between the Parent and the District regarding the Student's grades at least until he entered high school.  The grades reported to the Parent were true and accurate grades the Student earned. The misunderstanding arose because the Parent believed the grades represented the Student's achievement on academic material at the Student's chronological grade level, when in fact the Student was working on academic material far below as part of the modified curriculum in his self-contained special education classrooms. While understandable, it is concluded this misunderstanding does not rise to the level of a procedural violation of the IDEA sufficient to find a procedural denial of FAPE.

**Failure to Provide Appropriate Instruction to Allow the Student to Progress Academically**

20.     The Parent argued the District failed to provide the Student with appropriate instruction when it did not provide sign language interpretation or extended school year services (ESY).  The District's SLP recommended as early as 1999 that the Student be provided with manual signing to augment his educational program.  This was further documented by the District MDT team.  The District reevaluated the Student in January 2002, and again recommended signing training.  The Student's third-grade teacher did not pursue signing because the Student was 'self-conscious."  Expert testimony establishes the District should have known as early as 1999 that training in either SEE or ASL was necessary in order for the Student to access instructional content.  It is concluded that by failing to include some form of systematic training in a signing system, the District substantively violated the IDEA and denied the Student educational benefit.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 33

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

48

21.     The District has never provided the Student with ESY services. A box on the Student's IEP forms was routinely checked "no" to in response to a question whether the Student needed ESY services. The only other documentation of any consideration of ESY services is the reference in the District's reevaluation of the Student in 1999, which noted there was insufficient information to determine any need at that time, and a remark in the Student's 1999 IEP, stating that his learning problems are not the result of a lack of school opportunity. Only at hearing did Ms. Merz opine the results of her 2007 assessment might indicate the Student was eligible for ESY services. Taken as a whole, there is not sufficient evidence to conclude the District denied the Student FAPE by not providing ESY services for the Student.

### Failure to Provide Transition Planning for the Student

22.     The District has failed to provide any transition planning for the Student. Transition planning should have first been included with the Student's October 5, 2008 IEP. WAC 392-172A-03090(1)(j). There is no transition planning of any kind on either that IEP or the Student's October 5, 2009, IEP. This is a substantive violation of the IDEA, and it is concluded denied the Student FAPE.

### Change in the Student's Disability or Eligibility Category

23.     The Parent argued the District denied the Student FAPE by changing his eligibility category without any date to support the change. The evidence primary relied upon were the IEPs reflecting SLD as the disability category or with references to SLD in the body of the IEP. It has been found as fact this is was more likely than not a mere clerical error, and that there was no substantive changes to the Student's IEPs. It is concluded there is no denial of FAPE.

### Change in the Student's Placement During Ninth Grade and Failure to Provide Support Services

24.     The District changed the Student's placement from a self-contained special education classroom in eight grade to a combination of resource room and general education placement prior to any amendment of his IEP or reevaluation. It is concluded this is procedural violation of the IDEA. There is no evidence of record the Parent was made aware of this prior to the change in placement. It is concluded this significantly impeded the Parent's right to participate in the decision-making process, and is a denial of FAPE. An IEP must identify aids, services and other supports to be provided in general education classes to enable students to be with non disabled students. WAC 392-172A-03090(1)(d). The Student's IEP was not amended prior to his placement in general education classes in ninth grade. This is both a substantive and procedural violation of the IDEA, and a denial of FAPE.

### Failure to Place the Student in his Least Restrictive Environment

25.     The Parent argued the District denied the Student FAPE by placing him a self-contained special education classroom with nonverbal and mentally impaired students. The Student was placed in a self-contained classroom for his academic instruction from first through eighth grades, although he did receive instruction in a special education resource room during eighth grade. Over

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

49

the course of these years the other students in the Student's self-contained classrooms varied considerably including severely disabled students receiving basic life-skills instruction, cognitively impaired students and students that functioned at levels of achievement commensurate with the Student. The issue, however, is fundamentally not the level or severity of the other Student's disabilities. The issue is whether a self-contained class was the Student's LRE. The four-part test to determine any student's LRE was set out in the *Rachel H.* case. None of those factors include consideration of the other children in the Students' self-contained classroom. Each of those factors must be considered.

26.     The Student is not cognitively impaired and has normal or average intellectual functioning sufficient to participate in a general education program. The Student's disability is his inability to access instructional content due to his severe hearing impairment. Had the District provided the Student with an appropriate FM system, SLP services and sign training, i.e. the appropriate supplemental aids and services, from the time he entered kindergarten, it is concluded the likely would have been able to participate in a general education curriculum and classroom during many if not most of the years he spent in a self-contained classroom. The educational benefits of participation in a general education classroom over a self-contained classroom are manifest, as are the non-academic benefits of interaction with children who are not disabled. The record is clear that the Student was well-liked by his teachers, motivated to learn, and his presence in a general education classroom with the appropriate supplemental aids and services would have presented no negative effect on the teacher or other children in the classroom. Finally, the cost of mainstreaming the Student likely would have been no more than the cost of an appropriate FM system and staff time to provide additional SLP services and sign training. Given the circumstances of the student in *Rachel H.*, who even with the expense of a consultant and part-time aide was determined to require placement in a general education classroom as her LRE, it is inconceivable how the likely cost of mainstreaming the Student would not justify his placement in a general education class.

27.     It is not possible to conclude with certainly with exact number of years the Student was not in his LRE when he was assigned to a self-contained classroom. Initially perhaps a year or two in a self-contained classroom would have been necessary once the District provided an appropriate educational program with an FM system, sign training and SLPs services. But it is concluded that there was a period of many years during the Student's first through eighth grades when, had he been provided FAPE, he would have been able to participate as a general education student. It is concluded that by failing to place the Student in his LRE, the District denied the Student FAPE.

## The Parent's Requested Remedies

28.     The District has denied the Student FAPE as reflected in the above Conclusions of Law. The Parent's requested remedies are set out as part of the Issues statement. Each will be considered in turn.

29.     Parent attended an IEP team meeting on December 14, 2009, where on her behalf Sherry Mashburn requested an IEE for the Student. The District neither paid for an IEE nor requested a due process hearing. The Parent then obtained evaluations of the Student from Dr. Marlowe and Ms. White. The Parent has requested the District reimburse her for the full cost of the collaborative IEE

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

50

by Dr. Marlow and Ms. White. It is concluded the Parent is entitled to reimbursement from the District for the cost of an IEE. WAC 392-172A-05005. However, despite the characterization of the IEE by Dr. Marlowe and Ms. White as "collaborative," it is concluded that these were effectively two separate evaluations of the Student. The Parent is entitled to reimbursement of only one of the evaluations. The Parent shall choose which of Dr. Marlowe's or Ms. White evaluations for which she seeks reimbursement, and submit appropriate documentation in the form of bills, invoices, etc., to the District. The District shall reimburse the Parent for the full cost of either Dr. Marlowe's or Ms. White evaluation.

30. The Parent has requested payment by the District of all costs for an appropriate private educational placement and program for the Student, as well as compensatory education services to the Student, with specific services to be determined. The Parent's Closing Argument sets out in greater detail the Parent's requested remedies. However, the evidence of record does not support all of the remedies requested in the Closing Argument.

31. Compensatory education is not a contractual remedy, but an equitable one. "There is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497, 21 IDELR 723 (9th Cir. 1994).

32. After careful review of the extensive record in this matter and much deliberation, it is concluded the Parent should receive the following in response to her request for private placement and compensatory education for the Student. The District shall contract with Dr. Marlowe and Ms. White to design and implement an educational program and placement for the Student which is consistent with the recommendations contained in Dr. Marlowe's Neuropsychological Evaluation (Exhibit P70) and the recommendations contained in Ms. White's Consultation Services Report (Exhibit P72, Attachment 2). The program shall be designed and implemented for the Student within 60 calendar days of the entry of this Order. The District shall bear all costs and expenses associated with the design and implementation of this educational program. The program shall continue for a period of **six years** from the date it is implemented. It is concluded that the Student is likely to benefit from such a highly individualized and intensive program such that six years will more likely than not place him in the same position he would have been in had the District provided him with FAPE during the entire period at issue.

33. The Parent's requests for Spanish language interpreter services, translation of documents, oral interpretation, recording of meetings and five hundred hours of tutoring in ASL for the Parent and other family members is denied.

34. The Parent's request for payment of all litigation costs, including expert witness fees and attorneys' fees incurred in connection with this matter and any subsequent related appellate and/or litigation processes is denied.

35. All arguments made by the parties have been considered. Arguments that are not specifically addressed have been duly considered but are found to have no merit or to not substantially affect a party's rights.

Findings of Fact, Conclusions of Law and Order
Cause No. 2010-SE-0008
Page 36

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206)389-3400 1-800-845-8830
FAX (206) 587-5135

5¹

# ORDER

1.     The District has denied the Student a free appropriate public education.

2.     The Parent is entitled to reimbursement for one evaluation of the Student. The Parent shall choose which of Dr. Marlowe's or Ms. White evaluations for reimbursement, and shall submit appropriate documentation in the form of bills, invoices, etc., to the District.  The District shall reimburse the Parent for full cost of the evaluation.

3.     The District shall contract with Dr. Marlowe and Ms. White to design and implement an educational program and placement for the Student consistent with the recommendations contained in Dr. Marlowe's Neuropsychological Evaluation (Exhibit P70)and the recommendations contained in Ms. White's Consultation Services Report (Exhibit P72, Attachment 2).  The program shall be designed and implemented for the Student within 60 calendar days of the entry of this Order.

4.     Any disputes or disagreement between the Parent and the District regarding the details of the educational program and placement designed by Dr. Marlowe and Ms. White shall be taken to the Office of Superintendent of Public Instruction (OSPI) for resolution. OSPI shall be responsible for enforcement of the terms of this Order.

5.     The District shall bear all costs and expenses associated with the design and implementation of this educational program and placement.  The program shall continue for a period of **six years** from the date it is implemented.  Any disputes or disagreements between the Parent and the District regarding costs or expenses shall be taken to OSPI for determination and enforcement.

6.     The Parent's requests for Spanish language interpreter services, translation of documents, oral interpretation, recording of meetings and five hundred hours of tutoring in ASL for the Parent and other family members is denied.

7.     The Parent's request for payment of all litigation costs, including expert witness fees and attorneys' fees incurred in connection with this matter and any subsequent related appellate and/or litigation processes is denied.


          Signed at Seattle, Washington on October 13,  2010.


MATTHEW D. WACKER
Administrative Law Judge
Office of Administrative Hearings

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

52

Final Decision

## Further Appeal Rights: Information About Your Right To Bring A Petition For Reconsideration And Your Right To Bring A Civil Action

### Reconsideration

This is a final administrative decision. Pursuant to RCW 34.05.470, either party may file a petition for reconsideration within 10 days after the ALJ has served the parties with the decision. Service of the decision upon the parties is defined as the date of mailing of this decision to the parties. A petition for reconsideration must be filed with the ALJ at his/her address and served on each party to the proceeding.  The filing of a petition for reconsideration is not required before bringing a civil action under the appeal provisions of the IDEA.

### Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. If a timely petition for reconsideration is filed, this ninety-day period will begin to run after the disposition of the petition for reconsideration pursuant to RCW 34.05.470(3). The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Administrative Resource Services.

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  38

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

## CERTIFICATE OF SERVICE

I certify that I mailed a copy of this order to the within-named interested parties at their respective addresses postage prepaid on the date stated herein. _____

Parents

Diann Zavola, Special Programs Director
Grandview School District
913 W 2nd St
Grandview, WA 98930
*via US Mail*

Kerri W. Feeney, Attorney at Law
Margaret Bridewell, Attorney at Law
Feeney Law Office PLLC
MacHunter Building
1177 Jadwin Avenue, Ste. 104
Richland, WA 99352
*via US Mail and Facimile*

Joni Kerr, Attorney at Law
800 NE Tenney Rd., Suites 110-123
Vancouver, WA 98685
*via US Mail and Facimile*

Artis Grant, Attorney at Law
Grant & Associates
3002 S 47th Street
Tacoma, WA 98409-4416
*via US Mail and Facimile*

cc:     Administrative Resource Services, OSPI
        OAH/OSPI Caseload Coordinator

Findings of Fact, Conclusions of Law and Order
Cause No.  2010-SE-0008
Page  39

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA  98101-3126
(206)389-3400  1-800-845-8830
FAX  (206) 587-5135

54